Aryeh **MOTZKIN**, Plaintiff,

v.

**TRUSTEES OF BOSTON UNIVERSITY,**
Defendant.

**C.A. No. 95–10450–RCL.**

United States District Court,
D. Massachusetts.

Aug. 5, 1996.

---

984

Janis M. Berry, Roche, Carens & DeGiacomo, Boston, MA, for Plaintiff.

Lawrence S. Elswit, Office of the General Counsel, Boston, MA, for Defendant.

LINDSAY, District Judge.

Report and recommendation accepted.

*REPORT AND RECOMMENDATION REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (FILED ORIGINALLY AS A MOTION TO DISMISS)*

(DOCKET NO. 6)

June 4, 1996

KAROL, United States Magistrate Judge.

In 1992, defendants, the Trustees of. Boston University ("Trustees" or "BU"), entered into a contract with plaintiff, Aryeh Motzkin ("Motzkin"), under which Motzkin would teach three courses per semester in BU's College of Liberal Arts ("CLA") during the academic years 1993–94, 1994–95, and 1995–96. By letter dated March 31, 1995, effective immediately, Motzkin was notified that the Trustees had voted to accept the recommendation of a specially appointed faculty committee that Motzkin's contract be terminated for cause. The committee's recommendation was based on its finding, following a several-day adjudicatory hearing, that Motzkin had sexually harassed students, sexually assaulted and harassed a faculty colleague, violated BU's Illegal Drugs and Alcohol Policy by serving alcohol to underage students, and made false reports to the hearing committee regarding the charges against him. Motzkin denies some of those charges, but he does not dispute that he is unfit to teach. To the contrary, he insists that, because of a psychological disorder from which he suffers that causes "disinhibition," (Am.Compl., docket no. 16, ¶¶ 7–9), he lacks sufficient control, even with counseling and medication, to refrain from engaging in intolerable conduct of the very type in which the faculty hearing committee found he had engaged. Nonetheless, he commenced this lawsuit challenging his termination on grounds ranging from breach of contract to discrimination on the basis of disability. (Compl., docket no. 1) Then, after BU had filed its present motion, Motzkin amended his complaint to include, among other things, a claim that BU defamed him and invaded his right to privacy by filing certain confidential documents and leaking information to the press. (Am. Compl.) For reasons stated below, I recommend that all eight counts of Motzkin's amended complaint be dismissed.[1]

## I. BACKGROUND AND PRIOR PROCEEDINGS

Unless otherwise noted, the facts stated in this section are either undisputed or stated in the light most favorable to Motzkin. *See,*

---

1. For reasons stated in a separate Memorandum and Order issued this date, Motzkin's related (but non-dispositive) motions for discovery pursuant

*e.g., Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir.1990).

### A. *Motzkin's Special Appointment*

Motzkin was initially hired by BU in 1987 or 1988 to teach courses within the CLA's Core Curriculum and Department of Philosophy. (Am.Compl. ¶ 5; Salary History and 1989 Faculty Salary Recommendation Form, attached to Aff. Counsel Regarding Contract Records, docket no. 13, of 5/8/95.) He was given the untenured rank of Associate Professor. (1989 Faculty Salary Form.) The record is unclear whether he was on a tenure track for a period of time prior to 1992, but, in any event, he had not obtained tenure by the end of 1992. Moreover, he had made it clear by his words and conduct that his overriding interest was teaching—not research, writing, or publishing. Accordingly, by letter dated December 4, 1992 (but dated November 7, 1992 on its second page), CLA Dean Dennis D. Berkey ("Berkey") offered Motzkin a special, three-year teaching appointment as a nontenured Associate Professor of the Humanities and Adjunct Associate Professor of Philosophy. (Def.'s Supplem.Mem.Supp.Mot. Dismiss ("Def.'s Supplem.Mem."), docket no. 21, Ex. 1.) For each semester through academic year 1995–96, Motzkin was to teach the equivalent of two courses within the Core Curriculum and one philosophy course within the Department of Philosophy. (*Id.*) As Berkey emphasized in his letter:

> This appointment is extended in recognition of your strong contributions in teaching to the Core Curriculum. *It is a special appointment, with primary emphasis on the teaching role.* Therefore, in accepting this appointment you must agree to relinquish any claim for tenure status on the basis of the longevity of your service on the faculty of Boston University.

(*See id.* ¶ 6 (emphasis added).) Motzkin accepted this "special appointment" on December 9, 1992. (*Id.* at 2.)

Although Berkey did not, in his December 4 letter, specifically alert Motzkin to the fact that his appointment could be terminated early for cause, he referred to the Faculty Handbook (the "Handbook") as governing the issue of reappointment and the question whether Motzkin would be eligible for future tenure consideration. (*See id.* ¶¶ 5, 7.) Both parties attached excerpts of the Handbook to their pleadings in this lawsuit and often referred to it as authoritative with respect to the issues in this case. This is not surprising, since the Handbook, by its terms, provides that the policies set forth in it "are applicable University-wide to all faculty employed by Boston University" and that "[a]n individual's acceptance of employment at Boston University is sufficient to make the terms of the University's policies applicable without further notice or agreement." (Mem.Supp.Def.'s Mot. Dismiss Compl. ("Def.'s Mem."), docket no. 8, Ex. C at 44.) On the basis of these statements, BU asserts, and Motzkin agrees, (Tr. of 7/13/95 Hr'g, docket no. 33, at 9, 64), that the policies and procedures set forth in the Handbook, including the ones discussed below dealing with early termination, are incorporated into Motzkin's contract.

The Handbook devotes an entire section to policies and procedures by which faculty members may be suspended or terminated on the basis of "gross neglect of duty or other applicable cause ... during the term of an appointment." (Handbook at 67–69.) Those particular policies and procedures were adopted December 4, 1990, which was approximately two years after Motzkin's initial appointment and two years before he accepted the appointment that is the subject of this lawsuit. (*Id.* at 67 n. *.) The Handbook sets forth an elaborate process that must be followed before a faculty member may be terminated for cause "during the term of an appointment." (*Id.* at 67–69.) The final step in that multi-stage process is described in the Faculty Handbook as follows:

> 8. *Consideration by the Board of Trustees.* The Board's review of the case shall be based on the record of the hearing [conducted by special committee of five faculty members appointed for that purpose] and any further briefs presented in

to Fed.R.Civ.P. 56(f) and for leave to file a sec-

ond amended complaint are denied.

writing by the principals and/or their representatives. The decision of the Board of Trustees shall be final.

It was pursuant to this process that the Trustees purported to terminate Motzkin's special appointment effective March 31, 1995. (Def.'s Mem.Ex.H.)

### B. Allegations Against Motzkin

Complaints against Motzkin first surfaced during the 1991–92 academic year, when several female students reported that he was pressuring them to attend a party at his house. (Def.'s Mem.Ex. D: Statement of the Grounds for the Suspension or Termination of the Appointment of Associate Professor Aryeh L. Motzkin ("Statement of Grounds"), dated 1/95, ¶ 4(a).) Because the students were unwilling to file formal charges, the Chairman of the Department of Philosophy, Professor Charles Griswold, raised the subject with Motzkin informally and advised him to be careful regarding his conduct toward students. (Id.)

The following fall, a student in one of Motzkin's classes registered concern to Assistant Dean Brian Jorgensen about an incident in which Motzkin had approached her where she worked and invited her to lunch. (Id. ¶ 4(b).) He addressed the matter with Motzkin, who gave assurances that he would avoid such conduct in the future. (Id.)

Concerns about Motzkin escalated shortly after September 11, 1993. On that date, Motzkin took an underage female student to dinner off campus, ostensibly to discuss the possibility of her doing some translation work for him. (Id. ¶¶ 3(b), 7; Motzkin Aff., docket no. 27, Ex. A: letter from Motzkin to Berkey of 9/28/93, at 2–3.) It is undisputed that, during dinner, in violation of BU's Illegal Drugs and Alcohol Policy, Motzkin purchased the student some wine to accompany her meal. (Id. at 2.) According to the student (but denied by Motzkin), he also made suggestive remarks. (Id. at 2–3; Statement of Grounds ¶ 3(b).) This incident prompted Berkey to issue a formal reprimand to Motzkin and a warning that "a future reoccurrence of this type of situation could result in more severe sanctions." (Am.Compl. ¶ 11;

Statement of Grounds ¶ 4(c) (quoting letter from Berkey to Motzkin of 10/18/93.))

In May 1994, Berkey received a memorandum from a female faculty member in which the faculty member alleged that, beginning in 1991, Motzkin had made repeated, unwanted advances toward her; had sexually assaulted her; and had frequently intimated that, in exchange for her favors, he would be willing to use his purported influence with senior administration officials to help her get tenure. (Def.'s Mem.Ex.D: Statement of Additional Grounds for the Suspension or Termination of the Appointment of Associate Professor Aryeh L. Motzkin ("Statement of Additional Grounds") ¶¶ 8–15.) The faculty member declined to file a formal complaint at that time, however. (Id. ¶ 16.)

In the summer of 1994, Berkey met with Motzkin and admonished him not to dine alone with female students away from campus. (Statement of Grounds ¶ 4(d).) He also told him that he was in a "strike-two situation," that his current contract would not be renewed, that he should start looking for another position, and that any additional misconduct would result in his termination. (Id.) Despite this explicit warning, Motzkin promptly took another underage student to dinner off campus on September 27, 1994; purchased alcohol for her in violation of BU's Illegal Drugs and Alcohol Policy; drove her to a suburban hotel (the circumstances are disputed but the fact that he did so is not); and allegedly engaged in offensive and inappropriate conduct. (Id. ¶¶ 3(c), 7; Motzkin Aff.Ex.A: letter to the Sexual Harassment Committee from Motzkin of 10/27/94 at 1–5.) Around the same time, one of Motzkin's former students came forward with allegations that, in October 1990, Motzkin had invited her to his house under false pretenses and made inappropriate remarks and suggestions of a sexual nature to her while they were there. (Id. at 5–6; Statement of Grounds ¶ 3(a).)

### C. BU's Response to Allegations Against Motzkin

In response to some of the foregoing allegations and pending their resolution, Berkey, by letter dated October 6, 1994, relieved

Motzkin of all teaching and other responsibilities. (Def.'s Mem.Ex. A: letter from Berkey to Motzkin of 10/6/94.) The letter referred to and invoked the CLA Policy on Sexual Harassment (the "CLA Policy"). (Aff.Pl.'s Counsel Verifying Docs. Re: Count VII Relating to Violation of Univ. Policies and Procedures ("Aff.Pl.'s Counsel"), docket no. 29, Ex.B.) It also warned Motzkin that "[t]he matters are of such gravity that they may provide a basis for seeking the termination of your employment for cause." (Letter of 10/6/94 at 1.)

It is unclear from the record what precise steps BU took to resolve the complaints against Motzkin under the CLA Policy. That issue is immaterial, however, because BU did *not* purport to terminate Motzkin pursuant to the CLA Policy. Rather, it purported to do so pursuant to the different set of university-wide policies and procedures set forth in the Handbook and which the Handbook, by its terms, makes applicable to all BU faculty members.[2] Therefore, in the discussion below, consideration will be given only to the investigation and adjudication of the allegations against Motzkin that purportedly took place in accordance with the policies and procedures set forth in the Handbook.

As noted, relevant excerpts from the Handbook are included in the record. (Def.'s Mem.Ex. C; Aff.Pl.'s Counsel Ex.C.) In essence, the Handbook lays out a several-step process for the resolution of questions raised regarding "the fitness of a faculty member ... whose term of appointment has not expired." (Handbook at 67–69.) First, an attempt is made to resolve the matter informally through discussion at the administrative level. (*Id.* at 68.) Second, if informal, administrative resolution is not achieved, an ad hoc committee of three faculty members is appointed to attempt to medi-

ate a settlement or, if that too is unsuccessful, to recommend to the Provost whether "formal proceedings should be instituted." (*Id.*) Third, formal proceedings are instituted if either the ad hoc committee *or* the Provost determines that it is appropriate to proceed further. (*Id.*) At that point, the Provost and the committee are required jointly to prepare a detailed statement of the grounds for suspension or termination, or, if they cannot agree on how to proceed, the Provost may prepare such statement unilaterally. (*Id.*) Then, pursuant to procedures prescribed in the Handbook, a committee of five faculty members is selected to hear the charges and a hearing is conducted. (*Id.*)

The accused faculty member is assured various rights in connection with the hearing, including the right to respond in writing and orally to the charges against him or her, to be represented by counsel, to call and confront witnesses and introduce evidence, and to demand that certain evidence be produced. (*Id.* at 68–69.) The Handbook also provides, however, that "the hearing shall be conducted in an informal manner reasonably calculated to ascertain the truth and shall not be limited by formal rules of evidence or other restrictions usually employed in legal proceedings." (*Id.* at 69.) Following the hearing, the committee must make a decision within ten days. (*Id.*) Specifically, it must make "explicit findings with respect to each of the charges presented." (*Id.*) Further, "if warranted," it shall "recommend suspension, termination, or other appropriate discipline." (*Id.*) Once it has completed its work, it delivers its report to the faculty member, the Provost, and the President. (*Id.*) The President then "may either reject the recommendation and terminate the proceedings" or forward the report to the Trustees, with or without his or her own recommendation.[3] (*Id.*) The Trustees then make

---

2. By their terms, the CLA Policy and the Handbook policies and procedures are not mutually exclusive, and there is nothing in the record that suggests that they are. Therefore, BU could presumably have proceeded against Motzkin directly under the Handbook procedures, bypassing the CLA Policy entirely.

3. The Handbook neither states nor implies that the President has the right to substitute his or

her findings for those of the committee or to recommend to the Trustees that a faculty member be disciplined in a case in which the committee, for whatever reason, *did not make such* recommendation. Further, it would not make sense in the context of the elaborate hearing structure mandated by the Handbook to find such right by implication. It thus appears that the President and, ultimately, the Trustees act in

a decision regarding disciplinary action, which decision, as noted, "shall be final." (*Id.*) At that point, restrictions on publicity are lifted and any announcement of the Trustees' decision must "include a statement of the Hearing Committee's findings." (*Id.*)

Various documents included in Exhibit D to the Memorandum in Support of Defendant's Motion to Dismiss Complaint (docket no. 8) reflect BU's compliance with the Handbook's pre-hearing procedural requirements. The earliest document in Exhibit D is a copy of a letter dated December 23, 1994, to the Provost from the three-member ad hoc committee appointed to consider the charges then pending against Motzkin. In the letter, the ad hoc committee reported its unanimous recommendation that formal proceedings be instituted. The next document in Exhibit D is a copy of a letter dated January 11, 1995, from the Provost to Motzkin in which the Provost advised Motzkin that he had accepted the ad hoc committee's recommendation and was enclosing the formal statement of charges that the Provost had formulated, "in consultation with the committee." The enclosed statement of charges described in detail most of the allegations set forth above. It omitted, however, any reference to the allegations that were contained in the May 1994 memorandum to Berkey from the faculty member, presumably because the faculty member was still unwilling to press charges. Another document included in Exhibit D is a copy of a letter dated January 25, 1995, from the Provost to Motzkin. The January 25 letter informed Motzkin that the charges against him had been amended to include the allegations of the faculty member who had, until then, "been unwilling ... to permit her testimony to be used." A detailed statement of the new charge was included, and Motzkin was given an additional fourteen days to prepare his response.

While BU was considering the charges against Motzkin in the fall of 1994, it received a letter dated November 21, 1994, from the attorney who was then representing Motzkin, Douglas T. Schwarz. (Def.'s Mem.Ex.B.) The letter purported to advise BU of "new information" regarding a "depressive disorder" from which Motzkin was purportedly suffering that, in combination with the medication he was taking and other factors, might have reduced his inhibitions, impaired his judgment, and caused him to "[take] a female student to dinner off-campus, inattentive to Dean Berkey's earlier letter about precisely this point." (*Id.* at 1–2.) The letter claimed that Motzkin was again under the care of a psychiatrist, Dr. Michael Johnson ("Johnson"), and that Johnson was hopeful that, with appropriate treatment, including an anti-depressant medication called Zoloft, "it is extremely unlikely that [Motzkin] will engage in inappropriate behavior in the future." (*Id.*) The letter went on to state:

> Dr. Motzkin's primary depressive disorder is a handicap under both state and federal law. The University's obligation under such circumstances is to accommodate a person with a handicap unless the accommodation required would impose an undue hardship. I believe that the reasonable accommodation requirement here entails the University monitoring Dr. Motzkin's progress using Zoloft under Dr. Johnson's care. If, as Dr. Johnson believes will be the case, the medication continues to substantially improve the situation, there would seem to be no legitimate reason for preventing Dr. Motzkin from returning to teaching. I suggest that if his improvement is enduring, it would be appropriate that he return to teaching as soon as is practically possible.

(*Id.* at 2.) This was the first communication that BU received from any source notifying it that Motzkin claimed to suffer from a

---

effect as a board of clemency, with power to reject the committee's recommendation, if any, that the faculty member be disciplined, but without independent authority to impose discipline if the committee has not made such recommendation. Although, for reasons discussed below, I need not reach the question in this case of the weight to be given to the committee's findings or the Trustees' decision, it should be noted that these procedures differ in material respects from those involved in *McConnell v. Howard Univ.*, 818 F.2d 58, 62, 67–70 (D.C.Cir.1987) (because university board of trustees was *not* bound by decision of faculty hearing committee in favor of tenured faculty member, court declined to give any effect either to findings of hearing committee or to decision by board of trustees to overrule those findings and impose discipline).

disability or that the erratic behavior in which he allegedly had engaged might be attributable to it.

By mid-January 1995, the five-member faculty committee appointed to hear the charges against Motzkin (the "Hearing Committee") had been appointed. (Def.'s Resp., docket no. 34, Ex. 3: Klafter Aff. ¶ 5.) It began conducting hearings on or about February 20, 1995. (Am.Compl. ¶ 16.) Motzkin was given the opportunity to testify, but, on advice of counsel, he chose to remain silent. (Pl. Motzkin's Opp'n Mot. Dismiss or Summ.J. ("Pl.'s Opp'n"), docket no. 11, at 3 n. 5; Def.'s Mem.Ex. E: Report of the Hearing Committee Considering the Proposed Suspension or Termination for Cause of Associate Professor Aryeh L. Motzkin (the "Report") at 1.) [4] Over a period of several days, numerous witnesses apparently did testify either in person or by affidavit, including Johnson and BU's own psychiatric expert, Dr. Louis Vachon ("Vachon"). Motzkin was represented throughout by counsel, and he attended all but the last day of hearings. (Report at 1.) During the course of the hearings, the Hearing Committee heard and ruled upon numerous objections and motions, some of which are the subject of this lawsuit and are discussed in more detail below.

On March 21, 1995, the Hearing Committee issued the Report. It "found the witnesses to be clear, forthright and credible," and it found the "evidence regarding manipulative, deceptive and harassing behavior on the part of Professor Motzkin" to be "compelling and believable." (*Id.*) Further, although not necessarily dispositive of the issue of discrimination that Motzkin has raised in this court, the Hearing Committee considered and rejected such claim:

Professor Motzkin's attorney argued that the University failed to take action to accommodate Professor Motzkin's alleged conditions or facilitate treatment of them. We have not found sufficient evidence to support this conclusion. Professor Motzkin was repeatedly counseled by superiors

concerning the unacceptability of his behavior and the potential consequences to his career. Nevertheless, his pattern of manipulation, deceit and harassment continued into the autumn of 1994. During this period, Professor Motzkin neither claimed an impairment nor sought accommodation for it.

The Committee is not persuaded that Professor Motzkin's newly claimed impairment can either excuse or provide grounds for the University to condone his continued harmful behavior. Whatever actions he may take in the future to address the source of the behavior do not justify, at this present time, his continuance as a faculty member at the University.

No evidence was presented that Professor Motzkin will in the foreseeable future modify his behavior.... Neither has he requested help from the University with the behavior, other than on one occasion when he suggested to a superior that he might be fined each time he did an act that was deemed inappropriate. Although Professor Motzkin appears to be a skilled teacher, on the basis of the evidence presented, he does not meet the standard of interpersonal behavior required of a faculty member at Boston University.

(*Id.* at 5–6.)

The Hearing Committee concluded that "the charges of harassment, sexual harassment, sexual assault, violation of the University's Illegal Drugs and Alcohol policy and lying against Associate Professor Aryeh L. Motzkin are true and proven." (*Id.* at 6.) It unanimously recommended that he be "terminated for cause." (*Id.*)

In accordance with the rules prescribed in the Handbook, the Hearing Committee transmitted the Report to the President. (Def.'s Mem.Ex. F: letter from John Silber to Board of Trustees of 3/22/95.) By letter to the Trustees dated March 22, 1995, the President notified the Trustees of his concurrence with the Hearing Committee's recommenda-

---

4. In her opposition to the present motion, Motzkin's counsel states, "Professor Motzkin, on advice of counsel, *could* not testify to define the factual disputes—leaving his factual story to be told in this lawsuit." (Pl.'s Opp'n at 3 n. 5.

(emphasis added).) No explanation is given and there appears to be no basis for the assertion that Motzkin "could" not testify. As discussed below, however, all this is immaterial in light of Motzkin's concession that he is unfit to teach.

tion that Motzkin's appointment "be terminated for cause effective upon the vote of the Board." (*Id.*) The Trustees accepted this recommendation, and Motzkin was notified by letter dated March 31, 1995, that his appointment had been terminated for cause. (Def.'s Mem.Ex. H: letter from John Silber to Motzkin.)

### D. Court Proceedings

Motzkin commenced the present lawsuit in Massachusetts Superior Court on or about February 17, 1995, or three days before the Hearing Committee began hearing testimony. (Compl.; Am.Compl. ¶ 16.) His original complaint contained four counts, including one count for breach of contract (Count II) and three counts for discrimination in violation, respectively, of Mass.Gen.L. ch. 93, § 103 (1994) (Count I), of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181–12189 (1994) (Count III),[5] and of section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (1994) (Count IV). On or about March 3, 1995, BU removed the case to this court on the ground, among others, that a federal question had been asserted. *See* 28 U.S.C. §§ 1331, 1441(b) (1994). At the end of March or the beginning of April of 1995, BU filed a motion to dismiss (docket no. 6) and a supporting memorandum (docket no. 8). Although BU had purported to file its motion pursuant to Fed.R.Civ.P. 12(b)(1) and (6), it attached a number of exhibits to its memorandum and specifically requested that the court treat the motion as one for summary judgment. (Def.'s Mem. at 1.) On or about May 8, 1995, Motzkin filed a pleading entitled "Plaintiff Motzkin Opposition to Motion to Dismiss or for Summary Judgment," and an amended complaint. (Docket nos. 11 and 16.)

Motzkin's amended complaint sets forth eight counts,[6] preceded by a general section entitled "Statement of the Facts." The "Statement of the Facts" section alleges that Motzkin "suffers from mental disorders," which disorders were purportedly documented in expert testimony that plaintiff submitted under seal with his amended complaint. (Am.Compl. ¶ 8.) It further alleges that Motzkin's mental disorders (and the medication prescribed to treat them) "cause disinhibition in certain actions so that an individual may engage in inappropriate conduct that otherwise in a non-disabled state the individual's mind inhibitions would forestop." (*Id.* ¶ 9.)

As noted, Motzkin's amended complaint was accompanied by, and specifically alluded to, relied upon, and adopted, expert testimony that Motzkin filed under seal in this proceeding and that had originally been submitted at the hearings conducted by the Hearing Committee. (Mot. Impound Two Docs., docket no. 14, and contents.) The filing that Motzkin made under seal in this case consists of two documents: (1) the Affidavit of Dr. Michael Johnson and (2) excerpts compiled by Motzkin's counsel of testimony by a psychiatric expert—Vachon—whom BU had apparently called as a witness at the termination hearing. In his affidavit, Johnson states his opinion that Motzkin suffers from "depressive disorders" and sleep apnea, which, in combination, "impair the Professor's ability to function and have a marked disinhibitive effect on his conduct." (Johnson Aff. ¶ 5.) Further, despite the use of medication, "the disorders remain chronic, at times improving, at times worsening." (*Id.* ¶ 6.) Johnson concludes that "Professor Motzkin suffers from disabilities that continue to impair his ability to function and such disabilities would have impaired his ability to recognize and conform his conduct to the boundaries that would appropriately mark the relationship that should separate a professor and his students." (*Id.* ¶ 9.) Along the same lines, Vachon, according to Motzkin's own summary of a portion of the testi-

---

5. Title III of the ADA deals with discrimination with respect to public accommodations. The original complaint did not include a claim under Title I, which deals with employment discrimination.

6. The eight counts were as follows: discrimination on the basis of disability in violation of Title I of the ADA (Count I), of the Rehabilitation Act (Count II), and of Title III of the ADA (Count III); breach of contract (Count IV); wrongful termination (Count V); estoppel (Count VI); violation of fair process rights in the internal termination hearing (Count VII); and defamation (Count VIII).

mony that Motzkin adopted and relied upon in his filings with this court, *"confirmed that there would be impairment in both social and occupational functioning, which would render one disabled from serving as a university professor."* (Pl.'s Submission of Excerpts from the Testimony Under Oath of BU's Psychiatric Expert Dr. Louis Vachon Confirming that Professor Motzkin Suffers from Disabilities at 8.)

As noted, the other pleading that Motzkin filed on May 8, 1995, was his opposition to defendant's motion. In his opposition, Motzkin again referred to and adopted the foregoing psychiatric testimony and opinion. (Pl.'s Opp'n at 3.) He agreed that Count I of his original claim, which had alleged discrimination on the basis of disability in violation of state law, was subject to dismissal for failure to exhaust state administrative remedies.[7] (*Id.* at 4–5.) With respect to the breach of contract count, Motzkin argued that summary judgment was precluded because of factual disputes regarding the existence of a contract, but he did not explain the basis for his claim that there had been a breach, except to state in conclusory terms that the contract "was wrongfully terminated." (*Id.* at 5.) With respect to the ADA count, he did not address BU's argument that Title I of the ADA, to the exclusion of Title III, concerned employment discrimination, but he did argue that BU was a place of public accommodation. (*Id.* at 6–7.) Finally, he did not at all address BU's arguments that, because, *inter alia*, he had admitted in his complaint that he was not "otherwise qualified" to perform the essential functions of a university professor, Motzkin had failed to state a claim under the Rehabilitation Act.

On or about June 16, 1995, BU filed Defendant's Supplementary Memorandum in Support of Motion to Dismiss. (Docket no. 21.) This supplementary memorandum addressed some of the points Motzkin had raised in his opposition to BU's original motion, as well as the new counts that were included for the first time in Motzkin's amended complaint. Oral argument on BU's motion was heard on

July 13, 1995. (Tr.) At the argument, after confirming that counsel had no objection, the court stated that it would treat BU's motion as one for summary judgment. (*Id.* at 4.) This was confirmed in a Scheduling and Procedural Order entered that date, (docket no. 22), which order also gave Motzkin until August 4, 1995, to file additional evidentiary material and, if he wished to do so, a motion for discovery pursuant to Fed.R.Civ.P. 56(f). Motzkin took full advantage of this opportunity to make these supplemental filings. (Docket nos. 24 and 26–30.) He also filed a motion for leave to file a second amended complaint, (docket no. 25), which motion is the subject of a separate memorandum and order entered this date. The voluminous filings concerning the present motion were finally completed in September 1995, upon the filing by BU of its response to Motzkin's supplemental filings, (docket no. 34), and a motion to impound certain documents that Motzkin had filed. (Docket no. 31.)

## II. ANALYSIS

### A. Procedural Considerations

Where, as here, materials "outside the pleading are presented to and not excluded by the court," Fed.R.Civ.P. 12(b) authorizes the court to convert a motion to dismiss for failure to state a claim into a motion for summary judgment, provided that all parties are given notice and the opportunity to present opposing materials. *See Whiting v. Maiolini,* 921 F.2d 5, 6–8 (1st Cir.1990). These requirements were satisfied here. The court will thus treat BU's motion as one for summary judgment.

The standard for summary judgment is familiar. Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). At the outset, the moving party must aver that there is " 'an absence of evidence to support the nonmoving party's' " position. *Garside,* 895 F.2d at 48 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)).

---

**7.** Motzkin's amended complaint does not include a claim under state law for discrimination on the   basis of disability.

To avoid summary judgment, the opposing party must produce affirmative evidence demonstrating a genuine issue for trial. *See Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir.1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). "[T]he nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue." *Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir.1989). While " 'summary judgment ... should be used sparingly ... where motive and intent play leading roles,' " *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 895 (1st Cir.1988) (quoting *Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962)), it is nevertheless available where, on the basis of undisputed facts, the moving party is entitled to prevail as a matter of law regardless of motive. *See, e.g., August v. Offices Unlimited, Inc.*, 981 F.2d 576, 581–82, 584 (1st Cir.1992) (holding summary judgment for employer proper because employee had conceded he was "totally disabled" and thus could not establish prima facie case under state civil rights statute similar to Title I of ADA and section 504 of Rehabilitation Act). In reviewing the nonmovant's case, "the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party." *See Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir.1983) (citation omitted). This court must therefore review the record in the light most favorable to Motzkin to determine whether he has adduced sufficient admissible evidence to raise a triable issue with respect to any of the eight counts of his amended complaint.

**B. Application of Summary Judgment Standard**

*Count I*

Motzkin asserts in Count I of his amended complaint that his termination vio-

lated Title I of the ADA. (Am.Compl. ¶ 26.) Title I prohibits employment discrimination "against a qualified individual with a disability," defined as a person who can perform the "essential functions" of his or her job, with or without reasonable accommodation. *See* 42 U.S.C. §§ 12111(8), 12112; *see also Southeastern Community College v. Davis*, 442 U.S. 397, 406–07, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979).[8] In response, BU argues, *inter alia*, that Motzkin was hired to be a teacher, but, by his own admission, he is not qualified to teach. (Def.'s Supplem.Mem. at 3–4; Def.'s Mem. at 12–16.) It further notes that Motzkin's own expert has opined that Motzkin has an impaired "ability to recognize and conform his conduct to the boundaries that would appropriately mark the relationship that should separate a professor and his students." (Def.'s Resp. at 6.) It also points out that Motzkin himself, by quoting Vachon's testimony, supports BU's argument that no genuine issue exists concerning whether Motzkin can perform the responsibilities of his former job. (Def.'s Supplem.Mem. at 4.) BU argues that, under these circumstances, Motzkin is clearly not qualified to teach, and teaching is without doubt an essential—indeed, the defining—function of the appointment that is the subject of this lawsuit. (Def.'s Mem. at 13–14; Def.'s Resp. at 6–7.) Thus, even assuming, *arguendo*, that Motzkin is an individual with a "disability" within the meaning of 42 U.S.C. § 12102(2) and that, contrary to the evidence, he was discharged not for his offensive conduct but "because of the disability," within the meaning of 42 U.S.C. § 12112(a), he is still not entitled to relief under Title I of the ADA.

The court was (and still is) unable to locate within any of Motzkin's many filings even a purported response to this seemingly irrefutable argument. For that reason, the court inquired pointedly at the oral argument whether it is Motzkin's position that "he is presently qualified as a result of the treat-

---

8. Because the ADA and the Rehabilitation Act contain similar language, courts have applied decisions based on the Rehabilitation Act to interpret the ADA. *Larkins v. CIBA Vision Corp.*, 858 F.Supp. 1572, 1583 n. 4 (N.D.Ga.1994); *see also Parker v. Metropolitan Life Ins. Co.*, 875

F.Supp. 1321, 1325 (W.D.Tenn.1995) (ADA case noting that analysis under prior Rehabilitation Act case is instructive because ADA provisions are to be construed consistently with similar Rehabilitation Act requirements).

ment he is now receiving," to which his counsel responded, "No." (Tr. at 50.) The court then asked whether Motzkin agrees that "he is not presently qualified [i.e., even with the treatment he is receiving] to be placed in a classroom teaching University students," to which his counsel responded, "Yes, but that is not the full range of the definition of a professor." (*Id.*) In an attempt to understand this last response, the court inquired whether it was Motzkin's position that, even if he was hired to teach, BU had an "obligation to accommodate [him] by putting him in a nonteaching position." (*Id.* at 51.) His counsel responded, "It's not my position." (*Id.*) When pressed to explain her position, however, counsel noted that professors do other things besides teaching, including research and writing, curriculum development, and grading examinations. (*Id.* at 53.) Motzkin's position thus seems to be that BU has an obligation to create a "teaching" position for Motzkin in which he would have all the responsibilities that other teachers have, with the notable exception of teaching.

Motzkin's argument must be rejected. Whatever incidental, non-teaching responsibilities other professors at BU might have, it is undisputed that Motzkin, consistent with his own preference, was given a special teaching appointment that required him to teach three courses per semester in the Core Curriculum and Department of Philosophy.[9] If he is unable to teach the courses that he was hired to teach, someone else will presumably have to teach them. Conversely, he was not hired to do research, or design curricula, or grade examinations, and BU certainly would not have given him the special appointment it did if that were all he was qualified to do. In light of Berkey's December 4, 1992, letter offering Motzkin a "special appointment, with primary emphasis on the teaching role," it simply cannot be disputed that teaching is an essential function of Motzkin's job.

Moreover, even if teaching were not an essential function of Motzkin's special appointment, there is no more reason to believe that Motzkin can be trusted to work in proximity to female colleagues—whether in the library, or on committees, or in other locations or capacities—than to teach female students. Whether or not Motzkin did the things he was accused of doing, there is no place in a university community for someone who is as incapable of controlling his impulses as Motzkin insists he is. *See Mazzarella v. United States Postal Serv.*, 849 F.Supp. 89, 96 (D.Mass.1994) ("Finally, and most importantly, the record demonstrates that *no* amount of accommodation by [the Postal Service] would necessarily protect its employees and its property from the plaintiff's potential fits.") Therefore, even if teaching were not an essential function of Motzkin's particular appointment, his proposal that he merely be removed from the classroom as a form of "reasonable accommodation" would be unacceptable.

Because Motzkin is incapable, with or without accommodation, of performing the essential functions of his job, there is no need to consider BU's other arguments regarding flaws in Motzkin's claim under Title I of the ADA. It should be noted, however, that case law supports a number of BU's alternative arguments. *See Little v. FBI*, 1 F.3d 255, 259 (4th Cir.1993) (employer subject to Rehabilitation Act must be allowed to terminate employee for "egregious misconduct" regardless of whether employee has a disability); *Mazzarella*, 849 F.Supp. at 97 (termination of an employee for improper conduct does not constitute discrimination because of a disability pursuant to Rehabilitation Act, even if the improper conduct is attributable to a disability); *August*, 981 F.2d at 580–81 & n. 4 (an employer has no obligation to offer another job to employee who, because of a disability, is unable to do the job he or she was hired to perform); *Taub v. Frank*, 957 F.2d 8, 11–12 (1st Cir.1992) (no liability under Rehabilitation Act for employer's failure to identify and offer treatment for an undisclosed disability that contributes to behavior that constitutes grounds for termination).

For all the foregoing reasons, I recommend that Count I of the amended complaint be dismissed.

---

**9.** The court expresses no opinion about whether teaching is an "essential function" of even non-specially appointed faculty members, other than to say that it would be surprising if it were not.

*Count II*

Count II of the amended complaint states a claim similar to Count I, except that it is brought under section 504 of the Rehabilitation Act of 1973 rather than the ADA. (Am.Compl. ¶ 27.) I recommend dismissal of Count II for the same reason I recommend dismissal of Count I. By his own admission, Motzkin is unfit to teach; therefore, he is not an "otherwise qualified individual with a disability," within the meaning of 29 U.S.C. § 794(a).

*Count III*

Count III of the amended complaint purports to state a claim under Title III of the ADA, 42 U.S.C. §§ 12181–12189. (Am. Compl. ¶ 28.) Title III addresses, among other things, discrimination on the basis of disability by places of public accommodation. Specifically, Title III proscribes discrimination on the basis of disability with respect to "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." *See id.* § 12182(a).

The parties' memoranda are somewhat confusing because they tend to deal with two separate issues without clearly distinguishing between them.[10] The first issue is whether Title III covers only *physical access* to the structures in which businesses that otherwise would be places of public accommodation are located. Some courts have answered this question in the affirmative, *see, e.g., Parker v. Metropolitan Life Ins. Co.,* 875 F.Supp. 1321, 1327–28 (W.D.Tenn.1995) ("Title III only addresses discrimination based on a disabled person's physical abilities to make use of the goods and services of a place of public accommodation"), but the First Circuit has read Title III more broadly. *See Carparts Distribution Ctr., Inc. v. Automotive Wholesalers Ass'n of New England, Inc.,* 37 F.3d 12, 18–20 (1st Cir.1994). The Title III question in *Carparts* was whether a business could be a place of public accommodation notwithstanding that members of the public did not physically have to go to it in order to purchase goods or services, *see id.* at 18, which question is not presented here. Nevertheless, in holding that a business could be a place of public accommodation under these circumstances, the court necessarily discussed the closely related question whether Title III deals only with physical access to places of public accommodation. *See id.* at 18–20. Again, the court read Title III broadly:

> Neither Title III nor its implementing regulations make any mention of physical boundaries or physical entry. Many goods and services are sold over the telephone or by mail with customers never physically entering the premises of a commercial entity to purchase the goods or services. To exclude this broad category of businesses from the reach of Title III and limit the application of Title III to physical structures which persons must enter to obtain goods and services would run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges and advantages, available indiscriminately to other members of the general public.

*Id.* at 20.

Despite this language, BU argues that, as a matter of law, Title III applies only "to issues of *physical access* to places of public accommodations." (Def.'s Mem. at 11.) *Carparts* clearly rejects this argument. On the other hand, Motzkin also clearly misses the mark when he construes the quoted passage as dispositive of the separate and more relevant of the two issues that BU raises: does Title III deal at all with employment discrimination, or is employment discrimination the exclusive domain of Title I? Since *Carparts* does not address this question, other sources must be considered.

I first consider the statutory language. Title III proscribes discrimination "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." *See* 42 U.S.C. § 12182(a). While it

---

10. Motzkin contends, and BU does not deny, that BU is a place of public accommodation. *See* 42 U.S.C. § 12181(7)(J) (including undergraduate and postgraduate schools and other places of education as public accommodations, provided that their operations affect commerce).

could be argued that the terms "privileges" and "advantages," in the abstract, are general enough to encompass employment opportunities, one does not ordinarily think of jobs as being among the "privileges" and "advantages" offered to members of the public by places of public accommodation. Title I, on the other hand, is entitled "Employment," and, by its terms, it clearly applies to virtually all aspects of the employment relationship. *See id.* § 12112 (proscribing discrimination in regard to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment"). Indeed, even with respect to physical (and other) accessibility issues within the employment context, it is Title I, not Title III, that directly addresses the area. Specifically, Title I provides that an employer's duty to make reasonable accommodation for employees with disabilities may include "making existing facilities used by employees readily accessible to and usable by individuals with disabilities." *See id.* § 12111(9)(A).[11] The legislative intent is so clear from the language of Titles I and III that one need not go beyond that language to conclude that employment discrimination is the exclusive province of Title I.

I proceed, nevertheless, to consider precedent. At least one case is squarely on point, and that case holds that "Title III does not govern employment practices." *See Parker*, 875 F.Supp. at 1328. In reaching its conclusion, the *Parker* court cited the following instructive excerpt from the legislative history of the ADA: "Title III is not intended to govern any terms or conditions of employment by providers of public accommodations ... employment practices are governed by title I of this legislation." *Id.* (citing S.Rep. No. 116, 101st Cong., 1st Sess. 58 (1989)).

Finally, as a matter of policy, it would make no sense to construe Title III as including employment practices within its scope. Indeed, to do so might wreak havoc with the careful balance that Congress attempted to strike in Title I between the rights of employers and the rights of workers with disabilities. For example, the term "qualified individual with a disability" appears in Title I, *see* 42 U.S.C. §§ 12111(8), 12112, but is absent from Title III. As a result, if Title III were construed to apply to employment practices, an employer would be within its rights under Title I, but might be liable under Title III, if it denied employment to an individual who, because of a disability, was incapable of performing the essential functions of the job.

I conclude that Title III does not apply to employment discrimination. For this reason, and because Motzkin does not otherwise allege a violation of Title III, I recommend that Count III of the amended complaint be dismissed.

*Count IV*

Count IV of the amended complaint, a barebones claim for breach of contract, states, in its entirety, "The University's termination of Professor Motzkin['s] employment contract constitutes a breach of the mutual rights and obligations of the employment contract." (Am.Compl. ¶ 29.) Nowhere within the amended complaint or Motzkin's other filings does Motzkin state any particular respect in which BU allegedly failed to honor any promise it made to him, other than to claim that BU terminated his contract prematurely and improperly. (*Id.* ¶ 1.) For this reason, the court specifically asked Motzkin's counsel at oral argument to identify the alleged breaches. (Tr. at 63.) Counsel identified three: a contract right not to be terminated in violation of the ADA; a contract right not to have the charges against him amended in violation of the procedures set forth in the Handbook; and a contract right that he not be terminated without an impartial termination hearing, or, more specifically, a hearing in which the clerk appointed by the Hearing Committee is not "an arm of the prosecutor." (*Id.* at 63–66.)

---

**11.** In addition, the Regulations to Implement the Equal Employment Provisions of the ADA specifically state that their purpose is "to implement title I of the [ADA], requiring equal employment opportunities for qualified individuals with disabilities," and several other ADA sections, none of which sections is located in Title III. *See* 29 C.F.R. § 1630.1(a).

It is important to note that Motzkin does not dispute that his contract may be terminated early for cause or that cause would include conduct of the type in which the Hearing Committee found he had engaged. These implicit concessions, in conjunction with Motzkin's admission that he suffers from a disinhibitory disorder that renders him unfit to teach and prone to engage in offensive behavior of the same type that he was charged with, would appear to be dispositive of all his contract claims. Thus, as noted, there can be no violation of the ADA, and, therefore, no breach of contract pursuant to Motzkin's theory that the contract incorporates the ADA, if Motzkin is incapable of performing the essential functions of his job.[12] Similarly, BU's alleged failure to observe certain procedural formalities prescribed by the Handbook would appear to be immaterial, since the outcome of a hearing conducted in a manner that Motzkin would deem "procedurally proper" would be the same, given Motzkin's concession that BU has the right to terminate his contract for cause and his admission that disinhibitory disorders render him unfit to teach.

Thus there is no need, in light of Motzkin's concessions and admissions, to consider Motzkin's two contract claims relating to procedures. In the interest of thoroughness, however, I will briefly review them to demonstrate that neither has merit.

First, Motzkin complains about an allegedly improper amendment of the charges against him to include the complaints documented by the faculty member in her May 1994 memorandum to Berkey. (Am.Compl. ¶ 33; Aff.Pl.'s Counsel ¶¶ 1–4, 6.) The gravamen of Motzkin's complaint is that it was a violation of BU's policies and procedures, and, thus, a breach of his contract, to allow the Hearing Committee to consider this particular charge before it had been considered by the Sexual Harassment Committee. (Id. ¶¶ 1–4, 6, Ex. D: Professor Motzkin's Mot. Limit Matters Before Faculty Committee Hearing.)

The first problem with this complaint is that it confuses the CLA Policy, which includes as one step in its process a hearing before a three-person ad hoc subcommittee of the CLA's Sexual Harassment Committee, (CLA Policy at 7), with the separate procedures prescribed in the Handbook. (Handbook at 67–69.) Neither the CLA Sexual Harassment Committee nor the three-person ad hoc subcommittee of the CLA Sexual Harassment Committee plays any role in disciplinary proceedings commenced pursuant to the Handbook, except that one option available to the CLA ad hoc subcommittee is to recommend that the dean initiate action to discipline or terminate the accused pursuant to university procedures. (CLA Policy at 8.) Under the Handbook procedures, the first step in the disciplinary process, if the matter cannot be resolved informally, is to refer the matter to an ad hoc committee of three faculty members, which committee is distinct from the CLA ad hoc subcommittee. (Handbook at 68.) If the ad hoc committee is unable to settle the charges, it makes "a recommendation as to whether formal proceedings should be instituted." (Id.) Significantly, however, the Provost may decide that formal proceedings be commenced even if the ad hoc committee had recommended otherwise. (Id.)

Given this structure, it is difficult to see how Motzkin could have suffered any prejudice as a result of the failure of the ad hoc committee to consider the faculty member's charges. The ad hoc committee considered all the other charges and recommended that formal proceedings be commenced as to those. It is inconceivable that, if the faculty member's additional charges had also been considered, the ad hoc committee would *not* have recommended formal proceedings as to the charges that it did consider. Although it is possible that the ad hoc committee would not have recommended that the formal proceedings include the faculty member's charges, the Provost would still have had the authority, pursuant to the Handbook, to make a unilateral decision to include them

12. In fact, Motzkin concedes, as he must, that his incorporation claim must fail if his ADA claims lack merit. (Tr. at 64–65.) Since I have concluded for reasons already stated that Motzkin's ADA claims lack merit, I will give no further consideration to this aspect of Motzkin's breach of contract claim.

anyway. (*Id.*) Under these circumstances, where it was the Provost who notified Motzkin of the decision to amend the charges to include the faculty member's complaint, no purpose would have been served to reconvene the ad hoc committee solely to have it consider the faculty member's complaint.[13]

Motzkin's second complaint regarding the hearing procedures is that the clerk to the Hearing Committee, Craig Klafter ("Klafter"), an Assistant to the Provost, allegedly worked actively with the BU prosecuting attorney and participated in the Hearing Committee's decision-making. (Am.Compl. ¶¶ 20, 32; Particularized Req. Disc. Under Fed. R.Civ.P. 56(f) Re Count VII, docket no. 28, at 2.) Motzkin's claim is apparently that Klafter's role detracted from the impartiality of the proceedings. Again, there are several problems with this theory.

First, there is no evidence that Klafter participated in the Hearing Committee's decision-making. To the contrary, each member of the Hearing Committee, and Klafter himself, has submitted an affidavit confirming that his duties were purely administrative.[14] (Def.'s Resp.Exs. 1, 3, 4.) The Hearing Committee made all the decisions and Klafter merely reduced them to writing after the committee had communicated them to him and reported them to the parties and their counsel. (*E.g., id.* Ex. 1: Garland Aff. ¶¶ 7, 12.)

Second, Motzkin seems to assume that, if Klafter or the Provost for whom he was an assistant had any role in investigating the underlying charges or recommending that they proceed to formal adjudication, Klafter would be disqualified from participating in the subsequent adjudication. But courts have repeatedly held in the administrative law context that it is not a violation of due process when persons much more involved in the investigative phase of a case than either Klafter or the Provost was participate directly in the adjudicative phase. *See, e.g., Withrow v. Larkin,* 421 U.S. 35, 46–55, 95 S.Ct. 1456, 1464–68, 43 L.Ed.2d 712 (1975); *Blinder, Robinson & Co. v. SEC,* 837 F.2d 1099, 1104–08 (D.C.Cir.), *cert. denied,* 488 U.S. 869, 109 S.Ct. 177, 102 L.Ed.2d 146 (1988). In the complete absence of any evidence of bias or partiality by Klafter, there is no reason to assume that Klafter's position as Assistant to the Provost, per se, would have rendered the proceedings unfair, even if Klafter, contrary to the evidence, had participated in decision-making. *See Roland M. v. Concord Sch. Comm.,* 910 F.2d 983, 997–98 (1st Cir.1990), *cert. denied,* 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991); *Greenberg v. Board of Governors of the Fed. Reserve Sys.,* 968 F.2d 164, 167–68 (2d Cir.1992) (although law clerk of administrative law judge had previously participated in investigation of case, judge not disqualified because law clerk played only ministerial role in adjudicatory process).[15]

There is a third problem with Motzkin's theory, but it relates only to one specific charge by Motzkin regarding Klafter's role. As he states in his affidavit, Klafter was dispatched by the Chairman of the Hearing Committee to interview a potential third-

---

**13.** As noted, the Provost gave Motzkin an additional fourteen days to respond to the faculty member's complaint, and Motzkin does not contend that this was inadequate. Nor does Motzkin suggest that the ad hoc committee's failure to consider the faculty member's complaint deprived him of an opportunity to settle it before the Hearing Committee considered it. Indeed, Motzkin could have attempted to settle that complaint in the additional fourteen days afforded to him for preparation.

**14.** One of Motzkin's motions for discovery pursuant to Fed.R.Civ.P. 56(f) sought discovery regarding Klafter's role. (Docket no. 28.) For reasons set forth in a separate Memorandum and Order issued this date, this motion is denied.

**15.** As BU has pointed out, all the faculty members on the Hearing Committee were themselves employees of BU, and, in that sense, they would all equally be vulnerable to the charge that they might be subject to undue influence. In the absence of any evidence that BU might have attempted to exert undue influence or that any member of the Hearing Committee might have succumbed to it or was otherwise biased, the faculty members' employee status, per se, would surely not be a basis for disqualification. *See Greenberg,* 968 F.2d at 167 (fact that administrative law judges are employees of agency whose actions they review is not a basis for disqualification). If it were, a procedure that was clearly designed to protect the accused faculty member by inserting a committee of his or her peers as a buffer between him or her and the administration could never serve its beneficial purpose.

party witness to determine whether the potential witness had any information that might be relevant to the pending charges. (Klafter Aff. ¶ 8.) Klafter, accompanied by an attorney from BU's Office of General Counsel and a student complainant, interviewed the witness for this purpose and tape-recorded the interview, without an expectation that the witness would be unavailable to attend the hearing. (*Id.*) As it turned out, the witness was on a work release program from a Massachusetts correctional institution. (*Id.*) By the time he was to testify, his work release status had been revoked, and he had been reincarcerated in the correctional institution. (*Id.*) Thus, he could not attend the hearing. (Garland Aff. ¶ 11.) The Hearing Committee offered Motzkin the option of convening the hearing at the correctional institution so that the witness's live testimony could be obtained, but Motzkin declined this offer. (*Id.; Def.'s Resp.Ex. 2 at 2–3.) Consequently, the Hearing Committee decided to admit the tape-recorded interview, pursuant to clear Handbook authority. (*Id.*) Particularly where this decision was made only after Motzkin had declined an offer that would have enabled the witness to give live testimony and that would have fully preserved Motzkin's right of cross-examination, there was no deprivation of "basic fairness." *See Cloud v. Trustees of Boston Univ.,* 720 F.2d 721, 725 (1st Cir.1983).

To summarize, because Motzkin concedes that he can be terminated for cause and is unfit to do the job he was hired to perform, his complaints about procedural unfairness of the process by which BU determined that cause for termination existed are immaterial. Even if his charges were material, there was no breach of contract because BU's procedures were fundamentally fair and in substantial compliance with those prescribed in the Handbook. For these reasons, I recommend that Count IV be dismissed.

### Count V

▮ Count V of the amended complaint, entitled "Wrongful Termination," consists of the following sentence: "The University has wrongfully terminated the employment of Professor Motzkin." (Am.Compl. ¶ 30.) Motzkin does not elaborate on or even men-

tion this claim in any of his filings. BU reasonably assumes in its supplementary memorandum that this count purports to state a claim under cases such as *Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251 (1977) and *Gram v. Liberty Mut. Ins. Co.,* 384 Mass. 659, 429 N.E.2d 21 (1981), which deal with the rights of at-will employees. As BU points out, however, Motzkin was not an at-will employee; he was an employee for a term of years who was terminated for cause. Moreover, there is no allegation that his termination was in violation of any public policy or in bad faith for the purpose of depriving him of compensation he had already earned. Therefore, the *Fortune* line of cases would seem to have no application here. Because there appears to be no other basis for a claim for "wrongful termination," and because Motzkin has shed no light on the subject, I recommend dismissal of Count V.

### Count VI

▮ Count VI of the amended complaint is entitled "Estoppel" and appears to assert that BU is estopped to terminate Motzkin because, among other reasons, it did not promptly commence disciplinary hearings at the first sign of a problem. (Am.Comp. ¶ 31.) This claim is clearly without merit. In order for there to be an estoppel, there must be some promise or representation by the party against whom the estoppel is asserted which induced reasonable, detrimental reliance by the person asserting the estoppel. *Cadrin v. New England Tel. & Tel. Co.,* 828 F.Supp. 120, 122–23 (D.Mass.1993) (citations omitted); *O'Blenes v. Zoning Bd. of Appeals,* 397 Mass. 555, 492 N.E.2d 354, 356 (1986). Motzkin has neither pled any of these elements nor produced any evidence that BU made any promise or representation that Motzkin would not be held accountable for his alleged offensive behavior. To the contrary, on each occasion that BU became aware of a problem, it raised the matter with Motzkin and urged him to act appropriately. The fact that it did not bring formal charges against or formally reprimand him prior to 1993 is attributable to the unwillingness of any complainant to press formal charges until that time. (Def.'s Supplem.Mem. at 9.)

Further, Motzkin cannot allege in good faith that he continued to engage in offensive conduct in reliance on the belief that BU had promised him or otherwise represented to him that he was free to do so. Finally, any reliance by Motzkin on such purported promise or representation that he could, with impunity, sexually harass students or sexually assault or harass faculty members would clearly be unreasonable as a matter of law. *See, e.g.*, 20 U.S.C. § 1681 (1994); *Lipsett*, 864 F.2d at 896–901.

I therefore recommend that Count VI be dismissed.

#### Count VII

Count VII, entitled "Violation of Fair Process Rights in the Internal Hearing," (Am. Compl. ¶¶ 32–33), merely restates the complaints regarding alleged procedural flaws that were addressed above in the discussion of the breach of contract count, Count IV. For the reasons stated in the above section, those allegations are meritless. I therefore recommend that Count VII be dismissed.

#### Count VIII

Count VIII is entitled "Defamation," and consists solely of this sentence: "The University defamed Plaintiff Motzkin and sought to cast him in a false light by filing as a public record in the Court confidential materials not subject to impoundment and by leaking distorted information to the press—all causing great harm to the reputation and privacy of Professor Motzkin." [16] (*Id.* ¶ 34.)

▮▮▮▮ To the extent that Motzkin seeks to allege a cause of action for defamation based upon BU's public filings with this court, such claim is barred by the absolute privilege applicable to statements made in the course of litigation, as long as the statements, as they do here, pertain to that litigation. *E.g.*, *Correllas v. Viveiros*, 410 Mass. 314, 572 N.E.2d 7, 10 (1991) ("Statements made in the course of a judicial proceeding which pertain to that proceeding are, of course, absolutely privileged and cannot support a claim of defamation, even if uttered with malice or in bad faith"). [17] With respect to the "false light" claim, Massachusetts has declined repeated invitations to recognize this tort. *See, e.g.*, *ELM Medical Lab., Inc. v. RKO Gen., Inc.*, 403 Mass. 779, 532 N.E.2d 675, 681 (1989), *modified by United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 551 N.E.2d 20, 23 (1990). Even if it were now inclined to do so, the tort of invasion of privacy by casting someone in a false light would no doubt be subject to the absolute privilege applicable to statements made in the course of judicial proceedings that pertain to that proceeding. *See Correllas*, 572 N.E.2d at 13 (claim for intentional infliction of emotional distress must fail if based on absolutely privileged statements, because "[a] privilege which protected an individual from liability for defamation would be of little value if the individual were subject to liability under a different theory of tort").

I therefore recommend that Count VIII be dismissed.

### III. CONCLUSION AND RECOMMENDATION

For all the foregoing reasons, I recommend that summary judgment be granted to

---

16. Count VIII is the subject of Motzkin's motion to amend. By separate Memorandum and Order entered this date, Motzkin's motion is denied.

17. Motzkin did not move to place the allegedly offending materials under seal. Had he done so, it is unlikely that the court would have granted such motion, assuming that it even would have had any discretion in the matter. *See Anderson v. Cryovac, Inc.*, 805 F.2d 1, 11 (1st Cir.1986) (suggesting that there may be a "right of public access to documents considered in rulings on dispositive pretrial motions," and citing Second and Seventh Circuit decisions recognizing such right). In any event, despite Motzkin's unsubstantiated claims to the contrary, the information was surely not confidential, since (1) the Handbook expressly provides that "[a]nnouncement of the Trustees' final decision shall include a statement of the Hearing Committee's findings, if this has not previously been made known" (Handbook at 69), and (2) this Report and Recommendation, which necessarily includes a statement of the reasons for my recommendation, is and must be a public document. In addition, before BU filed the allegedly offending materials, one of the complaining students disclosed detailed information to the press, (Klafter Aff. ¶¶ 14–16), and Motzkin himself gave a detailed account of the situation from his perspective to an Israeli news reporter for publication in an Israeli news magazine. (Def.'s Resp.Ex. 5: Elswit Aff. ¶¶ 7–8 and attached article dated 4/2/95, the title of which was translated as "I Kept My Hands to Myself.")

BU on all eight counts of the amended complaint.

## IV. IMPORTANT NOTICE OF RIGHT TO OBJECT AND WAIVER OF RIGHT TO APPEAL FOR FAILURE TO DO SO WITHIN TEN DAYS

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court **WITHIN 10 DAYS** of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court's order entered pursuant to this Report and Recommendation. *See United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980); *United States v. Vega,* 678 F.2d 376 (1st Cir.1982); *Scott v. Schweiker,* 702 F.2d 13 (1st Cir.1983); *see also Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).