

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-24-1998

# Menkowitz v. Pottstown Memorial

Precedential or Non-Precedential:

Docket 97-2041

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Menkowitz v. Pottstown Memorial" (1998). *1998 Decisions.* Paper 201.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/201

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 24, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-2041

ELLIOT MENKOWITZ, M.D.; SUSAN MENKOWITZ

      Appellants

v.

POTTSTOWN MEMORIAL MEDICAL CENTER; RICHARD
SAYLOR, M.D., INDIVIDUALLY AND AS AN AGENT OF
POTTSTOWN MEMORIAL MEDICAL CENTER; PATRICIA
DRAXLER, R.N., INDIVIDUALLY AND AS AN AGENT OF
POTTSTOWN MEMORIAL MEDICAL CENTER; HENRY
POLLAK, INDIVIDUALLY AND AS AGENT OF POTTSTOWN
MEMORIAL MEDICAL CENTER; JOHN J. BUCKLEY,
INDIVIDUALLY AS AN AGENT OF POTTSTOWN
MEMORIAL MEDICAL CENTER; MILTON D. MARTYNY,
INDIVIDUALLY AND AS AN AGENT OF POTTSTOWN
MEMORIAL MEDICAL CENTER; JOSEPH KRANTZLER,
M.D., INDIVIDUALLY AND AS AN AGENT OF POTTSTOWN
MEMORIAL MEDICAL CENTER; JOHN LIGNELLI, D.D.S.,
INDIVIDUALLY AND AS AN AGENT OF POTTSTOWN
MEMORIAL MEDICAL CENTER

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 97-cv-02669)

Argued June 5, 1998

Before: SCIRICA, NYGAARD and SEITZ, Circuit Judges

(Opinion Filed August 24, 1998)

Alan B. Epstein (Argued)
Scott A. Burr
JABLON, EPSTEIN, WOLF &
 DRUCKER
The Bellevue, Ninth Floor
Broad and Walnut Streets
Philadelphia, Pennsylvania 19102
 Attorneys for Appellants

Bill Lann Lee
Acting Assistant Attorney General

Jessica Dunsay Silver (Argued)
Marie K. McElderry
P.O. Box 66078
Washington, D.C. 20035-6078
 Attorneys for Department of Justice

Norman E. Greenspan (#17631)
 (Argued)
George J. Krueger (#30501)
Jordana Cooper (#62375)
Lesley S. Bonney (#77868)
Rebecca C. Ward (#79547)
Blank, Rome, Comisky &
 McCauley LLP
One Logan Square
Philadelphia, Pennsylvania 19103
 Attorneys for Appellees

OPINION OF THE COURT

SEITZ, Circuit Judge.

Dr. Eliot Menkowitz ("appellant") appeals the order of the district court granting defendants' Fed. R. Civ. P. 12(b)(6) motion to dismiss claims brought under the Americans with Disabilities Act, 42 U.S.C. SS 12101-12213 (1994) ("the ADA"), and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. S 794 (1994) ("the Rehabilitation Act"). In contesting the district court's interpretation of the ADA, appellant raises an issue of first impression in our court-- namely, whether Title III of the ADA, 42 U.S.C. SS 12181-12189

2

("Title III"), prohibits disability discrimination against a medical doctor with "staff privileges" at a hospital. Appellant also disputes the district court's causation analysis under section 504 of the Rehabilitation Act. The district court exercised subject matter jurisdiction pursuant to 28 U.S.C. S 1331 (1994). Our jurisdiction to consider these issues arises under 28 U.S.C. S 1291 (1994). We will review a dismissal for failure to state a claim, and in particular the legal interpretation of the federal statutes at issue, under a plenary standard. Lake v. Arnold, 112 F.3d 682, 684 (3d Cir. 1997).

I. Facts

Because this appeal comes to us from an order granting defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6), we take as established the relevant facts alleged in the appellant's complaint. Appellant is an orthopedic surgeon who, in 1973, joined the Pottstown Memorial Medical Center ("PMMC" or "the hospital"), which is a private, non-profit, community hospital. He alleges that he holds an appointment to the medical staff at PMMC, which is defined as "[a]ny duly licensed physician, dentist or podiatrist who has been appointed to membership by the Board and is privileged to attend patients or to provide other diagnostic, therapeutic, teaching or research services at the Hospital." Medical Staff By-Laws of PMMC, App. at 189.

The complaint further alleges that upon being diagnosed for attention-deficit disorder in July of 1995, appellant provided the hospital with a written report from his clinical psychologist and treating physician stating that the disorder would not affect his ability to treat patients or properly interact with the hospital staff. Subsequently, the hospital accused appellant of various infractions of hospital policies -- accusations which the appellant considered "a pattern of harassment and intimidation." Pl.'s Compl. P 26, App. at 14. On March 18, 1997, the hospital summarily suspended appellant's medical staff privileges without notice or a hearing in alleged violation of the hospital's own by-laws. The Medical Committee of the Board of Directors later heard testimony from various staff members, not

3

including the appellant, and ultimately approved the decision to suspend staff privileges for a six month period. The hospital also reported the suspension to the National Practitioner Data Bank for Adverse Information on Physicians and Other Health Care Practitioners, which would result in deleterious consequences to the appellant's insurance coverage and professional reputation.

As a result of these alleged events, appellant instituted this action under Title III of the ADA, alleging that PMMC discriminated against him on the basis of his disability by denying him the opportunity to participate in the medical staff privileges offered by the hospital. He also alleged a violation of the Rehabilitation Act through the hospital's interference with patient relationships solely by reason of his disability. The district court, in considering the ADA claim, relied on the "normal usage" of the phrase "public accommodation," and the statutory limitation in 42 U.S.C. S 12182(b)(1)(A)(iv), to conclude that Title III addresses discrimination only against individuals who patronize places that accommodate the public -- such as patients, customers, guests, and so forth. In the context of health care providers, the district court surmised that Title III protects only "those persons seeking medical care, and not the employees and other staff who serve them." Because the appellant in this case was not a person seeking medical care, the district court dismissed the ADA claim. With respect to the section 504 Rehabilitation Act claim, the district court held that the appellant failed to allege facts showing that the hospital had suspended staff privileges "solely by reason of . . . his alleged disability," and dismissed that claim as well. We turn to these issues seriatim.1

_____

1. Appellant, joined by his wife Susan Menkowitz, has also asserted a number of supplemental state law claims, which the district court declined to entertain once it dismissed the federal actions. See 28 U.S.C. S 1367(c) (1994). That determination will be vacated in our mandate. See Conclusions, infra.

4

II. The ADA

A. Plain Language of Title III

The question of whether Title III grants a cause of action to a doctor with hospital staff privileges is one of statutory construction and, as such, we begin with the language of the statute. Title III states as a "general rule":

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. S 12182(a). The statute does not define the term "individual" for purposes of this subchapter, nor does it define the phrase "goods, services, facilities, privileges, advantages, or accommodations." However, a "place of public accommodation" is defined in 42 U.S.C. S 12181(7) and specifically includes a hospital, provided it affects interstate commerce. 42 U.S.C. S 12181(7)(F). No party on appeal challenges the hospital's status as a place of public accommodation within the meaning of the ADA. The same is true of the hospital's effect on interstate commerce.

The term "discrimination" is not directly and uniformly defined in Title III. Instead, the statute provides several "general prohibitions" that constitute discrimination for purposes of the general rule found in 42 U.S.C.S 12182(a). See 42 U.S.C. SS 12182(b)(1)(A)(i)-(iii). They include, for example, the "denial of participation" in which it is recited:

> It shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity.

42 U.S.C. S 12182(b)(1)(A)(i). The statute also defines as discrimination, and hence conduct prohibited under the

5

general rule, the "participation in unequal benefit," 42 U.S.C. S 12182(b)(1)(A)(ii), and "separate benefit," 42 U.S.C. S 12182(b)(1)(A)(iii). It is noteworthy that these defining subparagraphs contain a limitation as set forth in 42 U.S.C. S 12182(b)(1)(A)(iv): "For purposes of clauses (i) through (iii) of this subparagraph, the term `individual or class of individuals' refers to the clients or customers of the covered public accommodation that enters into the contractual, licensing or other arrangement."

In addition to these delineations of discriminatory practices, Title III sets forth another set of "specific prohibitions" that define the term discrimination for purposes of the general rule announced in 42 U.S.C. S 12182(a). See 42 U.S.C. S 12182(b)(2)(A)(i)-(iv). Among these is:

> [A] failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C. S 12182(b)(2)(A)(ii). Unlike the "general prohibition" demarcations of discriminatory practice set out in 42 U.S.C. S 12182(b)(1)(A)(i)-(iii), these definitions of discrimination contain no language limiting the scope of the phrase "individual or class of individuals" as is found in 42 U.S.C. S 12182(b)(1)(A)(iv).

B. The Arguments on Appeal

Appellant vigorously attacks the district court's conclusion that Title III proscribes discrimination only against members of the hospital's "public," who consist of persons seeking medical care and not hospital staff members. Appellant bases his position on two grounds. First, under a plain meaning approach, appellant contends that the general rule found in 42 U.S.C. S 12182(a) literally applies to any "individual" and contains no restriction that would limit the scope of protected persons only to those

6

who patronize places that accommodate the public. Because a "privilege" offered by a hospital is staff membership to medical personnel, appellant maintains that he has a cause of action under Title III to the extent he was an "individual" who was denied the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of" the hospital. Second, appellant argues that a broad interpretation of those individuals affording Title III protection is consistent with the overall statutory scheme of the ADA and its legislative history.

The hospital disputes the appellant's analysis. It argues that Title III cannot be read to include any "individual" denied a privilege offered by a place of public accommodation. This reading, the hospital posits, would render Title I of the ADA, 42 U.S.C. SS 12111-12117 ("Title I"), which relates to employment discrimination, a nullity and would accordingly violate Congressional intent. Thus, the hospital concludes that "individuals" for purposes of Title III are limited only to those persons who are "customers or clients" that patronize the place of public accommodation. In the hospital's view, because appellant had a unique business relationship with the hospital he cannot sue as the member of the public protected by Title III.

C. Are Medical Staff Members "individuals" Protected by Title III When they Are Denied the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation"?

Given the language of the statute and the parties' arguments, we now turn to the issue directly posed in this appeal -- may a medical doctor with staff privileges properly assert a cause of action under Title III? It is not argued on appeal that the appellant failed to allege that the hospital's conduct would be discriminatory within the meaning of the ADA. Appellant has, in addition, alleged that the discrimination occurred on the basis of a disability as understood under the Act. Also, the parties do not dispute on appeal that appellant is "disabled" as that term

7

is defined in the ADA.2 Hence, the only remaining issue is whether the appellant is an "individual" who was denied the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of [the] place of public accommodation." 42 U.S.C. S 12182(a).

While the ADA does not define the terms "individual" or "goods, services, facilities, privileges, advantages, or accommodations," we would ordinarily seek to construe these words under their ordinary, plain meaning without a more involved inquiry into legislative history, congressional intent, or otherwise. See Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 81 (1995); Ford v. Schering-Plough Corp., 145 F.3d 601, 613 (3d Cir. 1998). Reading the language of the statute, however, immediately raises several problems in its construction. First, it is not abundantly clear whether an "individual" protected by the general rule in Title III refers only to "clients or customers of the covered public accommodation," as contained in 42 U.S.C. S 12182(b)(1)(A)(iv). Although the term "clients or customers" does not directly apply to the general rule itself, the district court surmised from this phrase that Title III protects "members of the public -- actual and would be guests, customers, and clients -- who seek the`full and equal enjoyment' of the services, facilities, or other accommodations of places that serve the public."

Perhaps more importantly, the term individual in Title III, if read broadly, may encroach upon the scope of Title I, which grants a cause of action not to an "individual" but to a "qualified individual with a disability." 42 U.S.C. S 12112(a). Title I explicitly defines the phrase "qualified
_____

2. The hospital in its brief to this court invites us to affirm the district court's dismissal of appellant's Title III claim on the ground that he is not disabled within the meaning of 42 U.S.C. S 12102(2). Although we may affirm the district court on any ground raised before it, see Neely v. Zimmerman, 858 F.2d 144, 149 (3d Cir. 1988), we decline to accept the hospital's invitation at this stage of the litigation. Appellant in his complaint states that his disability is "a disorder recognized as a disability under the" ADA and the Rehabilitation Act. Pl.'s Compl. P 8, App. at 11. We find this allegation, which we must accept as true, sufficient to meet the notice pleading requirements of Fed. R. Civ. P. 8 with respect to his disability.

individual with a disability," see 42 U.S.C. S 12111(8), and federal courts have long since explored and construed its meaning. Nevertheless, it is by now well established that "[h]owever inclusive may be the general language of a statute, it `will not be held to apply to a matter specifically dealt with in another part of the same enactment.' " Fourco Glass Co. v. Transmirra Prods. Corp., 353 U.S. 222, 228 (1957) (citations omitted). This canon of construction carries particular force where, as here, Congress has enacted a comprehensive legislative scheme and has "deliberately targeted specific problems with specific solutions." Varity Corp. v. Howe, 516 U.S. 489, 519 (1996) (Thomas, J., dissenting); HCSC-Laundry v. United States, 450 U.S. 1, 6 (1981) (per curiam). Hence, we face a statutory puzzle; because of the potentially expansive nature of the term "individual," and ultimately the scope of Title III protection, we run the risk of rendering meaningless in many cases the differences between Title I and Title III. This would include, for example, significant disparities in coverage, remedies, and construction. As a result, we are compelled to explore the ADA's legislative history in order to fully understand the scope and meaning of Title III as applied to this case.

1. Legislative History and Congressional Intent

Among the broadly stated purposes of the ADA, see 42 U.S.C. S 12101(b), is the intent to "invoke the sweep of congressional authority . . . in order to address the major areas of discrimination faced day-to-day by people with disabilities." Id. S 12101(b)(4). This comes after a specific finding by Congress that discrimination against individuals with disabilities persist in many critical areas, including "health services." 42 U.S.C. S 12101(a)(3). Indeed, there is little doubt that Congress intended the ADA as a comprehensive remedial statute with broad ramifications. See 42 U.S.C. S 12101(b)(1); Penny v. United Parcel Serv., 128 F.3d 408, 414 (6th Cir. 1997).

Navigating the sea of the ADA's legislative history and supporting documentation is a considerable task, but several important beacons emerge as to what Congress intended to cover under Title III as opposed to Title I of the

ADA. First, it is evident that Congress sought to regulate disability discrimination in the area of employment exclusively through Title I, notwithstanding the broad language of Title III. As the Senate report makes clear, "Title III is not intended to govern any terms or conditions of employment by providers of public accommodations or potential places of employment; employment practices are governed by [T]itle I of this legislation." S. Rep. No. 101-116, at 58 (1989). See also Ford v. Schering-Plough Corp., 145 F.3d 601, 612 (3d Cir. 1998); Parker v. Metropolitan Life Ins. Co., 121 F.3d 1006, 1014 (6th Cir. 1997) (en banc); Motzkin v. Trustees of Boston Univ., 938 F. Supp. 983, 996 (D. Mass. 1996). Similarly, the House Report states that Title I "sets forth prohibitions against discrimination on the basis of disability by employers, employment agencies, labor organizations, or joint labor-management committees . . . with respect to hiring and all terms, conditions, and privileges of employment." H.R. Rep. No. 101-485, pt. 2, at 54 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 336; see also id. at 99, reprinted in 1990 U.S.C.C.A.N. 303, 382. Accordingly, it is apparent that Congress did not intend Title III -- despite the breadth of its language-- to govern discrimination within the employment setting and we cannot construe Title III in a manner that would eviscerate such a salient legislative mandate.

Our conclusion is reinforced by Congress' 1992 amendment of the Rehabilitation Act, providing that"[t]he standards used to determine whether [section 504] has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990." 29 U.S.C. S 794(d). The Senate Report explains that this and similar provisions, see 29 U.S.C. S 793(d), were intended to "ensure uniformity and consistency of interpretations." S. Rep. No. 102-357, at 71 (1992), reprinted in 1992 U.S.C.C.A.N. 3712, 3782.

Apart from the potential intersection between Title I and Title III, the legislative history sheds little light on the intended meaning of an "individual" who is denied the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" of a place of

10

public accommodation as those words are used in 42 U.S.C. S 12182(a). What is clear, however, is that the legislative use of the phrase "customers or clients of the covered public accommodation that enters into a contractual arrangement" was not intended to restrict the general class of persons entitled to sue under Title III, contrary to the district court's conclusion. The House Report observes that in restricting the term individuals to "clients or customers of the covered public accommodation," the intent was to ensure that"a public accommodation's obligations are not extended or changed in any manner by virtue of its lease with another entity." H.R. Rep. 101–485, pt. 2., at 104 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 384. To illustrate, the report states:

> [A] store located in an inaccessible mall or other building, which is operated by another entity, is not liable for the failure of that other entity to comply with this Act by virtue of having a lease or other contract with that entity. This is because, as noted, the store's legal obligations extends only to individuals in their status as its own clients or customers, not in their status as the clients or customers of other public accommodations. Likewise, of course, a covered entity may not use a contractual provision to reduce any of its obligations under this Act.

Id. Thus, Congress intended the phrase "customers or clients of the covered public accommodation that enters into a contractual, licensing or other arrangement," 42 U.S.C. S 12182(b)(1)(A)(iv) (emphasis added), to encompass the relatively narrower situation where several entities enter into a contractual or other relationship. See H.R. Rep. 101–485, pt. 2., at 101 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 384 ("The section has never been intended to encompass the clients or customers of other entities.") (emphasis in original). It is therefore not surprising that the term "clients or customers" does not appear in Title III or its legislative history other than in reference to contractual or other arrangements. Indeed, the "clients or customers" limitation set forth in 42 U.S.C. S 12182(b)(1)(A)(iv) does not directly apply to the general rule established in section 12182(b) but instead covers the instances of

11

"discrimination" described in sections 12182(b)(1)(A)(i)-(iii), all of which encompass "contractual, licensing, or other arrangement."

Finally, the legislative history to the ADA demonstrates that in enacting Title III, Congress intended to extend the scope of protection afforded to those individuals under the Rehabilitation Act. The House Report, for example, states that "Section 504 of the Rehabilitation Act of 1973 prohibits Federal agencies and recipients of Federal financial assistance from discriminating against persons with disabilities. The purpose of [T]itle III . . . is to extend these general prohibitions against discrimination to privately operated public accommodations and to bring individuals with disabilities into the economic and social mainstream of American life." H.R. Rep. No. 101-485, pt. 2, at 99 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 381-82. Much of the remaining legislative history echoes this intention. See generally 1 Henry H. Perritt, Americans with Disabilities Act Handbook S 1.2, at 4 (1997) (collecting examples). The ADA itself states that "[N]othing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973." 42 U.S.C. S 12201(a). Courts, including our own, have accordingly examined Rehabilitation Act precedent in examining the scope of coverage under the ADA. See Yeskey v. Commonwealth of Pennsylvania Dep't of Corrections, 118 F.3d 168, 170 (3d Cir. 1997), aff'd, 118 S. Ct. 1952 (1998); 1 Perritt, supra, S 1.2, at 4.

2. Case Law

With these principles in mind, we turn to the question of whether the appellant is an "individual" who is denied the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" of a place of public accommodation as those terms are used in Title III. We do not write on a blank slate and it is appropriate at this juncture to examine precedent interpreting this phrase within the framework of Title III's language.

In Ford v. Schering-Plough Corp., 145 F.3d 601 (3d Cir. 1998), this court considered whether a disparity between

disability benefits for mental and physical disabilities violated Title III of the ADA. Id. at 612–14. The plaintiff in that case argued that insurance benefits offered by her employer, and indirectly its insurance carrier, contained unequal disability benefits and therefore denied her the equal enjoyment of a "service" or "privilege" offered by a place of public accommodation. Our analysis of that contention led us to reach two important conclusions relevant to this appeal. First, relying on the ADA's legislative history, we dismissed the plaintiff 's claim under Title III against her employer because Title I, and not Title III, governed the "terms and conditions of employment by providers of public accommodations." Id. at 612 (quoting S. Rep. No. 101–116, at 58 (1989)). Before even reaching the interpretation of the words "service" or "privilege" under Title III, we noted that insurance benefits were offered in the context of her employment and therefore the terms of Title I exclusively governed her action against her employer.

With respect to the plaintiff's claim in Ford against her insurance carrier, this court concluded that while insurance benefits may be ordinarily considered a type of "service," "privilege," or "advantage," they are not services of the place of public accommodation. Id. We reasoned that under the plain meaning of Title III, a public accommodation is a physical place and therefore the phrase "goods, services, facilities, privileges, advantages, or accommodations" refer to "what these places of public accommodation provide." Id. at 613. In aligning ourselves with the Court of Appeals for the Sixth Circuit, see Parker v. Metropolitan Life Ins. Co., 121 F.3d 1006 (6th Cir. 1998) (en banc), we required at the very least some "nexus" between the physical place of public accommodation and the services denied in a discriminatory manner. Ford, 145 F.3d at 613; see also Parker, 121 F.3d at 1011 (looking to a "nexus between the disparity in benefits and the services which [the defendant] offers to the public from its insurance office"); but see Carparts Distribution Ctr., Inc. v. Automotive Wholesaler's Ass'n of New England, Inc., 37 F.3d 12, 19–20 (1st Cir. 1994) (holding that Title III is not limited to physical structures). Because the disparate insurance benefits offered by an insurance office do not relate to the insurance office itself -- that is, the physical

13

place of public accommodation -- the plaintiff in Ford could not state a cause of action under Title III of the ADA.

3. Analysis

Under the language of Title III, its legislative history, and the principles announced in Ford, we must conclude that the appellant has properly stated a cause of action as an "individual" discriminated against in the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." At the outset, we cannot accept the district court's blanket interpretation that Congress intended Title III to apply only to members of the "public," which the district court defined as those guests, clients, or customers who seek the services, facilities, or privileges offered by a place of public accommodation. The operative rule announced in Title III speaks not in terms of "guests," "patrons," "clients," "customers," or "members of the public," but instead broadly uses the word "individuals." Looking to the term "public accommodation," a term of art defined in 42 U.S.C. S 12181(7), does not aid the inquiry either because that phrase does not define the rights protected under the ADA and there can be no question that an operator of a hospital falls under the prohibitions associated with Title III. Similarly, the district court's reliance on the term "clients or customers" is equally misplaced. As both the language of Title III and its legislative history clearly demonstrate, the phrase "clients or customers," which only appears in 42 U.S.C. S 12182(b)(1)(A)(iv), is not a general circumscription of Title III and cannot serve to limit the broad rule announced in 42 U.S.C. S 12182(a).

Equally unavailing is the hospital's argument that illustrations cited by the ADA's legislative history all describe instances of members of the public as clients or customers. That a statute can be "applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 499 (1985) (citation omitted); see also Pennsylvania Dep't of Corrections v. Yeskey, 118 S. Ct. 1952, 1955 (1998). Nor can we agree with the hospital's

14

argument that Title III offers no protection against disability discrimination by virtue of the appellant's "unique business relationship" with the hospital. This contention runs contrary to the plain language and legislative history of Title III which in no way mentions any sort of "business relationship" that would preclude an "individual" from asserting a cause of action if denied the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation."

Similarly unpersuasive is the hospital's attempt to read significance into the absence of the phrase "qualified individual" from Title III, which appears in Title I, Title II, and the Rehabilitation Act. While the hospital argues that the absence of such a phrase indicates that Title III was never meant to apply in the "workplace," wefind no support for such a contention in the broadly drafted language of Title III itself, which prohibits "operators of a public accommodation" from discriminating against "individuals." Moreover, as stated by the United States Court of Appeals for the First Circuit, the absence of the "qualified individual" language from Title III would make little difference in a case, such as this, where the plaintiff seeks reasonable accommodation:

> We find little difference in this distinction, because many of the issues that arise in the "qualified" analysis, also arise in the context of the "reasonable modifications" or "undue burden" analysis. That is, if more than reasonable modifications are required of an institution in order to accommodate an individual, then that individual is not qualified for the program.

Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 154 (1st Cir. 1998). Thus, because the appellant in this case alleges that the hospital failed to "accommodate" his disability, see Pl.'s Compl. P 46(a), App. at 18, the hospital is free to show that the relief requested would "fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." See 42 U.S.C. S 12182(b)(2)(A)(ii). Similarly, in no way would a hospital be forced to accommodate an unqualified physician if he "poses a direct

15

threat to the health and safety of others." 42 U.S.C.
S 12182(b)(3).

We do agree with the hospital, however, that Title III was not intended to govern disability discrimination in the context of employment. See Ford, 145 F.3d at 612; S. Rep. No. 101-116, at 58 (1990). But the appellant in this case never alleged that he is an employee of the hospital or that he was denied the benefits associated with employment. The appellant's complaint instead alleges that he was "appointed to the Medical Staff of PMMC," App. at 8, and both parties maintain that his relationship with the hospital is not strictly one of employment but more in the nature of an independent contractor. See Pl.'s Br. at 23; Mem. in Support of Def.'s Motion to Dismiss Compl. at 9 n. 4. Federal courts, including our own, have commented on the indicia of employment for purposes of the disability discrimination laws, see, e.g., EEOC v. Zippo Mfg. Co., 713 F.2d 32, 36-38 (3d Cir. 1983) (considering the Age Discrimination in Employment Act); Birchem v. Knights of Columbus, 116 F.3d 310, 312 (8th Cir. 1997) (considering Title I of the ADA); Cilecek v. Inova Health System Services, 115 F.3d 256, 260-61 (4th Cir. 1997) (considering Title VII of the Civil Rights Act); Alexander v. Rush North Shore Medical Center, 101 F.3d 487, 492 (7th Cir. 1996) (same), and the analysis typically focuses in a myriad of fact-intensive considerations. The By-Laws of the hospital governing staff membership speak of staff "privileges" and "prerogatives," and do not themselves characterize the relationship between a medical staff member and the hospital as one of employment. The definition set forth in the By-Laws of a member of the medical staff is "[a]ny duly licensed physician, dentist or podiatrist who has been appointed to membership by the Board and is privileged to attend patients or to provide other diagnostic, therapeutic, teaching or research services at the Hospital." App. at 189. However, we cannot say more at this stage of the litigation because we must accept as true the facts as alleged in the appellant's complaint and any reasonable reading of the pleadings. See Holder v. City of Allentown, 987 F.2d 188, 193 (3d Cir. 1993). It is quite clear in this case, as both the hospital and the district court have stated, that the appellant proceeded on the basis that he was not an

16

employee of the hospital and therefore not within the province of Title I.

Assuming that the appellant is not an employee of the hospital as that term is understood under Title I, the only remaining question is whether he was denied the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." We look for, as we did in Ford, some nexus between the services or privileges denied and the physical place of the hospital as a public accommodation. Ford, 145 F.3d at 613. There can be little doubt that the appellant fulfills such a requirement in this case. Because of the appellant's suspension from the active medical staff, he can no longer enjoy the hospital's physical facilities in providing the necessary medical and consulting services to his patients. See By-Laws P 8.3(b)(i), App. at 135. Hence, the hospital denied the appellant the requisite physical access that we found lacking in Ford. This case is quite unlike a disparity in insurance benefits which had nothing to do with the facilities of an insurance office, or the "place" of public accommodation. Here, we cannot imagine a greater nexus between the privileges, advantages, or services denied and physical access to hospital facilities simply because of the nature of medical staff privileges -- privileges that lie at the very core of a hospital's facilities.

We therefore hold that a medical doctor with staff privileges -- one who is not an employee for purposes of Title I -- may assert a cause of action under Title III of the ADA as an "individual" who is denied the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." Our conclusion is reinforced by several observations. First, we may effectively find no recourse under the ADA for the appellant if we were to hold that the he has no cause of action under Title III. That is, the appellant may not be a "qualified individual" under Title I because there was no employment relationship with a covered entity, and the appellant would not be protected under Title III because he is not an "individual" who is denied the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any

17

place of public accommodation." We cannot see how Congress intended such a result given the ADA's remarkable breadth of language and purpose -- especially when Congress expressly states that it seeks to comprehensively regulate "discrimination against individuals with disabilities in such critical areas as . . . health services." 42 U.S.C. S 12101(a)(3). Second, nothing in the Rehabilitation Act would prevent a physician with staff privileges from asserting a cause of action based on disability discrimination. See Landefeld v. Marion General Hospital, 994 F.2d 1178 (6th Cir. 1993). Notfinding a similar cause of action under the ADA would lead to the perverse result that the ADA affords less protection than the Rehabilitation Act to a discrete class of disabled individuals. This squarely contradicts the language and intent of the ADA. See 42 U.S.C. S 12201(a). Finally, the administrative guidance issued by the Justice Department interprets Title III to allow a cause of action for physicians with staff privileges. See U.S. Dep't of Justice, Civil Rights Division, The Americans with Disabilities Act: Title III Technical Assistance Manual P 4.1100, illus. 4 (Nov. 1993). As the agency charged by Congress to issue implementing regulations, the Department's views are entitled to deference. Bragdon v. Abbott, 118 S. Ct. 2196, 2199 (1998).

Accordingly, we will reverse the district court's order dismissing appellant's disability discrimination claim brought under Title III of the ADA.

III. The Rehabilitation Act

In addition to appellant's ADA claim, the complaint sets forth a cause of action under section 504 of the Rehabilitation Act, 29 U.S.C. S 794, which the district court dismissed because, in its view, appellant failed to allege that the hospital suspended staff privileges solely because of his disability. Appellant argues that the complaint sufficiently alleges facts that would permit the fact-finder to infer discrimination solely on the basis of his disability. We now turn to the sufficiency of the complaint.

18

A. Elements of a Section 504 Rehabilitation
Action Claim

Section 504 of the Rehabilitation Act states, in relevant
part:

> No otherwise qualified individual with a disability in
> the United States . . . shall, solely by reason of her or
> his disability, be excluded from the participation in, be
> denied the benefits of, or be subjected to
> discrimination under any program or activity receiving
> Federal financial assistance or under any program or
> activity conducted by any Executive agency or by the
> United States Postal Service.

29 U.S.C. S 794(a). We have held that in order to establish
a violation under this section, the plaintiff must prove:

> (1) that he is a "handicapped individual" under the Act,
> (2) that he is "otherwise qualified" for the position
> sought, (3) that he was excluded from the position
> sought "solely by reason of his handicap," and (4) that
> the program or activity in question receives federal
> financial assistance.

Strathie v. Department of Transp., 716 F.2d 227, 230 (3d
Cir. 1983); see also Wagner v. Fair Acres Geriatric Ctr., 49
F.3d 1002, 1009 (3d Cir. 1995). As the Supreme Court has
previously stated, the Rehabilitation Act does not impose an
affirmative action obligation on recipients of federal
assistance. See Southeastern Community College v. Davis,
442 U.S. 397, 410-14 (1979). Instead, the Act is cast in
negative terms and prohibits discriminatory action when an
otherwise qualified individual is excluded from a position
sought solely by reason of his handicap. See Jeremy H. v.
Mount Lebanon Sch. Dist., 95 F.3d 272, 278 (3d Cir. 1996).
The parties do not dispute at this stage of the litigation that
appellant has sufficiently alleged he is a "handicapped
individual," he is "otherwise qualified," and the hospital
receives federal financial assistance.3  The only remaining

_____

3. The hospital once again asks this court to affirm the dismissal of
appellant's Rehabilitation Act claim on the ground that he is not a
"handicapped individual." For reasons stated above, see supra note 2, we
decline this alternative ground for affirmance.

19

issue, therefore, is whether appellant has properly alleged he was excluded from the position sought "solely by reason of . . . his disability." 29 U.S.C. S 794(a).

Many courts, including our own, have opined as to the meaning of the causation requirement embodied in the phrase "solely by reason of " an individual's disability. The Second Circuit Court of Appeals, for example, held that the "solely by reason of " language was "designed to weed out section 504 claims where an employer can point to conduct or circumstances that are causally unrelated to the plaintiff 's handicap." Teahan v. Metro-North Commuter R.R., 951 F.2d 511, 515 (2d Cir. 1991). We have previously stated that a plaintiff stating a claim under section 504 need not allege an intent to discriminate on the part of the employer. See W.B. v. Matula, 67 F.3d 484, 492 (3d Cir. 1995). Where the complaint alleges intentional discriminatory conduct, a plaintiff may make a prima facie case of causation if he was denied a benefit for which he was qualified "and was rejected under circumstances indicating discrimination on the basis of an impermissible factor." Smith v. Barton, 914 F.2d 1330, 1340 (9th Cir. 1990) (quoting Doe v. New York Univ., 666 F.2d 761, 766 (2d Cir. 1981); see also Prewitt v. United States Postal Serv., 662 F.2d 292, 305 (5th Cir. 1981).

B. The Appellant's Complaint

As the hospital correctly points out, the appellant did not explicitly allege in his complaint that the suspension of staff privileges occurred "solely by reason of " his disability. However, certain factual allegations contained in the complaint would no doubt permit an inference of discrimination solely on the basis of appellant's known disability because of the timing and circumstances of his suspension. For example, appellant alleges in his complaint that after he informed the hospital of his disability, "defendant PMMC . . . engaged in a pattern of harassment and intimidation of plaintiff, unfairly and disparately accusing him of minor infractions of hospital policies." Pl.'s Compl. PP 26, 46(b), App. at 17, 18. The complaint further alleges that less than a year later, the hospital suspended appellant's medical staff privileges without a hearing and

20

with full knowledge of his disability. Id. PP 27-28, App. at 15. On the other hand, the complaint, at times, would allow a contrary inference that the hospital suspended appellant's staff privileges because of various whistle blowing activities. Id. P 21, App. at 13-14 ("[B]ased on dissatisfaction with plaintiff 's repeated articulated concerns regarding omissions in medical care at PMMC, defendant[ ] PMMC . . . accused plaintiff of allegedly inappropriate behavior unrelated to the quality of patient care rendered by plaintiff."). Yet, that inference is undermined by the fact that Menkowitz had criticized hospital practices for over twenty years without suffering adverse consequences. Id. P 20, App. at 13.

Based on this recitation of the facts, which we must accept as true at this stage of the litigation, it is evident that appellant has sufficiently alleged causation as required under section 504 of the Rehabilitation Act. It is, of course, firmly established that in reviewing a Fed. R. Civ. P. 12(b)(6) motion, we must draw all reasonable inferences in the plaintiff 's favor. See Schrob v. Catterson, 948 F.2d 1402, 1405 (3d Cir. 1991). Just as a pleading must "be construed as to do substantial justice," Fed. R. Civ. P. 8(f), see also Conley v. Gibson, 355 U.S. 41, 47-48 (1957), a plaintiff generally need not explicitly allege the existence of every element in a cause of action if fair notice of the transaction is given and the complaint sets forth the material points necessary to sustain recovery. See 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure S 1216, at 154-162 (2d ed. 1990). This is especially so if the material deficiencies in the complaint stem from nothing more than inartful pleading -- the precise sort of pleading as a highly developed form of art that the federal rules sought to abandon. See Conley, 355 U.S. at 48. Simply put, the complaint will withstand a Fed. R. Civ. P. 12(b)(6) attack if the material facts as alleged, in addition to inferences drawn from those allegations, provide a basis for recovery.

In this case, the appellant has set forth sufficient factual circumstances to permit an inference to be drawn that the hospital suspended medical staff privileges solely by reason of his handicap as prohibited under section 504 of the Rehabilitation Act. The hospital was fully aware of the

appellant's disability and, nearly a year later, suspended staff privileges without notice or explanation. In the interim, the hospital is alleged to have engaged in a "pattern of harassment and intimidation, unfairly and disparately accusing" appellant of hospital policy infractions. These facts give us pause and would no doubt create, at the very least, an inference which must be drawn in the appellant's favor -- specifically, that the hospital suspended staff privileges solely based on the appellant's known disability. Although it is true, as the hospital points out, certain inferences may be drawn against the appellant -- for example, that it was the appellant's raising "concerns regarding quality of care assurance issues" which provided the basis for suspension -- contrary inferences alone will not justify a dismissal under Fed. R. Civ. P. 12(b)(6). See Fuentes v. South Hills Cardiology, 946 F.2d 196, 202 (3d Cir. 1991). We have instead inquired whether the plaintiff will be able to prove any set of facts consistent with those allegations in the complaint that would sustain recovery. See Trump Hotel & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998). That the hospital suspended appellant's staff privileges solely on the basis of his disability is such a fact that may be proved and therefore the district court erred in dismissing the Rehabilitation Act claim on this ground.

Accordingly, we will reverse the district court's order dismissing appellant's claim set forth under section 504 of the Rehabilitation Act.

IV. Conclusions

For the foregoing reasons, we will reverse the order of the district court dismissing appellant's federal claims and remand for further appropriate proceedings. We will also vacate the order of the district court declining to exercise supplemental jurisdiction over appellant's state law claims, in light of our determination with respect to appellant's federal claims.

22

SCIRICA, Circuit Judge, dissenting in part and concurring in part.

Although the majority reaches a beneficial result, I am constrained to dissent because I find no support in either the statute or legislative history that Title III of the Americans with Disabilities Act, 42 U.S.C.A. SS 12101– 12213 (West 1994 & Supp. 1998) (ADA), provides plaintiff a cause of action. Dr. Menkowitz, a physician with hospital staff privileges, did not bring suit under Title I of the ADA, which generally governs discrimination in the employment relationship.

I agree with much of the majority's review of the relevant statutes. By its express terms, Title I of the ADA addresses the terms and conditions of employment and protects individuals from workplace discrimination.[1] The definition of "qualified individual with a disability" demonstrates the exclusivity of Title I's role in prohibiting employment discrimination: "[it] means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires . . . . " 42 U.S.C.A. S 12111(8). In Ford v. Schering–Plough Corp., ___ F.3d ___, No. 96–5674, 1998 WL 258386, at *12 (3d Cir. May 22, 1998) (citations omitted), we stated explicitly: "[t]erms and conditions of employment are covered under Title I, not Title III. `Title III is not intended to govern any terms or conditions of employment by providers of public accommodations or potential places of employment;

_____

1. Title I provides, in part:

    (a) General Rule

     No covered entity shall discriminate against a qualified individual
    with a disability because of the disability of such individual in
    regard to job application procedures, the hiring, advancement, or
    discharge of employees, employee compensation, job training, and
    other terms, conditions, and privileges of employment.

42 U.S.C.A. S 12112(a) (West 1995).

23

employment practices are governed by [T]itle I of this legislation.' "2

I do not believe Title III of the ADA is available to Dr. Menkowitz. Title III "specifically addresses discrimination by owners, lessors, and operators of public accommodations," Parker v. Metropolitan Life Ins. Co., 121 F.3d 1006, 1010 (6th Cir. 1997),3 and protects members of the public. See

_____

2. See also Parker v. Metropolitan Life Ins. Co., 121 F.3d 1006, 1014 (6th Cir. 1997) ("the statutory framework of the ADA expressly limits discrimination in employment practices of Title I of the ADA"); Leonard F v. Israel Discount Bank of New York, 967 F. Supp. 802, 804 (S.D.N.Y. 1997) ("Title III is not intended to govern any terms and conditions of employment by providers of public accommodations. Employment practices are governed by Title I") (citation omitted); Motzkin v. Trustees of Boston Univ., 938 F. Supp. 983, 995-96 (D. Mass. 1996) ("Title I . . . is entitled `Employment,' and, by its terms, it clearly applies to virtually all aspects of the employment relationship").

3. Title III provides, in part:

        (a) General Rule

         No individual shall be discriminated against on the basis of
        disability in the full and equal enjoyment of the goods, services,
        facilities, privileges, advantages, or accommodations of any place
of
        public accommodation by any person who owns, leases (or leases
        to), or operates a place of public accommodation.

42 U.S.C.A. S 12182(a) (West 1995). The discrimination generally prohibited is found in 42 U.S.C.A. S 12182(b):

        (b) Construction

         (1) General Prohibition

         (A) Activities

         (i) Denial of participation

         It shall be discriminatory to subject an individual or class of
        individuals on the basis of a disability or disabilities of such
        individual or class, directly, or through contractual, licensing,
or
        other arrangements, to a denial of the opportunity of the
individual
        or class to participate in or benefit from the goods, services,

facilities, privileges, advantages, or accommodations of an entity.

* * *

24

42 U.S.C.A. S 12182(b)(1)(A)(iv) ("For purposes of clauses (i) through (iii) of this subparagraph, the term `individual or class of individuals' refers to the clients or customers of the covered public accommodation that enters into the contractual, licensing, or other arrangement") (emphasis supplied).

Protecting recipients rather than providers, Title III ensures customers and clients access to the full enjoyment of goods and services free from disability based discrimination. The goods and services offered by the Pottstown Memorial Medical Center are health care and medical services. The "public" for purposes of Title III refers to those persons desiring medical care, not those seeking staff privileges. "Staff privileges" do not appear to constitute "privileges" as that term is articulated in Title III. The apparent privilege is access to medical care and health care facilities irrespective of disability, not the privilege of serving on the staff of the health care provider. See Motzkin, 938 F. Supp. at 995-96 ("While it could be argued that the terms `privileges' and `advantages' [in Title III] in the abstract, are general enough to encompass employment opportunities, one does not ordinarily think of jobs as being among the `privileges' and `advantages' offered to members of the public by places of public accommodation").

_____

     (2) Specific prohibitions

     (A) Discrimination

     For purposes of subsection (a) of this section, discrimination
     includes (i) the imposition of application or eligibility criteria
that
     screen out or tend to screen out an individual with a disability or
a
     class of individuals with disabilities from fully and equally
enjoying
     and goods, services, facilities, privileges, advantages, or
     accommodations unless such criteria can be shown to be necessary
     for the provision of the goods, services, facilities, privileges,
     advantages, or accommodations being offered.

42 U.S.C.A. SS 12182(b)(1)(A)(i), (b)(2)(A)(i). See e.g., Parker, 121 F.3d at
1010 ("Title III specifically prohibits, inter alia, the provision of unequal
or separate benefits by a place of public accommodation") (citing 42
U.S.C.A. SS 12182(b)(1)(A)(i)-(iii)).

Moreover, the list of "public accommodations" in 42 U.S.C.A. S 12818(7) suggests Title III covers only discrimination against guests, customers, and clients of places held open for service to the general public.4 See

_____

4. 42 U.S.C.A. S 12181(7) includes, inter alia,

      (A) an inn, hotel, motel, or other place of lodging . . . .

      (B) a restaurant, bar or other establishment serving food or drink;

      (C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

      (D) an auditorium, convention center, lecture hall, or other place of public gathering;

      (E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

      (F) a Laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

      (G) a terminal, depot, or other station used for specified public transportation;

      (H) a museum, library, gallery, or other place of public display or collection;

      (I) a park, zoo, amusement park, or other place of recreation;

      (J) a nursery, elementary, secondary, undergraduate, or post graduate private school, or other place of education;

      (K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

      (L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation

See Sharrow v. Bailey, 910 F. Supp. 187, 192 (M.D. Pa. 1995) ("The professional offices of health care providers are places of public accommodation for ADA purposes") (citations omitted).

Recent jurisprudence reveals "public accommodation" is defined with some specificity. See Ford, 1998 WL 258386, at *12-13 (noting it is "all of the services which the public accommodation offers, not all services which the lessor of the public accommodations offers, which fall within

26

Ford, 1998 WL 258386 at *12 ("the `goods, services, facilities, privileges, advantages, or accommodations' concerning which a disabled person cannot suffer discrimination are not free standing concepts but rather all refer to the statutory term `public accommodation' and thus to what these places of public accommodation provides"). As noted, the "services" and "privileges" provided by Pottstown Memorial Medical Center are medical services, not staff privileges, and thus Title III, on its face, would not apply to Dr. Menkowitz.

When compared to other provisions of the ADA and the Rehabilitation Act prohibiting discrimination, the proscription imposed by Title III appears more narrowly drawn. Title II, addressing discrimination by public entities, broadly provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C.A. S 12132 (West 1995). Similarly, the prohibition against discrimination mandated by the Rehabilitation Act broadly states, in part:

> (a) Promulgation of rules and Regulations
>
> No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

_____

the scope of Title III . . . . Restricting `public accommodations' to places
is in keeping with the jurisprudence concerning Title II of the Civil Rights
Act of 1964"); Parker, 121 F.3d at 1014 (finding "[t]he clear connotation of the words in S 12181(7) is that a public accommodation is a physical place" and concluding "the provision of a long-term disability plan by an employer and administered by an insurance company does not fall within the purview of Title III").

27

29 U.S.C.A. S 794(a) (West Supp. 1998).

Dr. Menkowitz contends he is not an employee, but rather a physician with staff privileges. Yet, Dr. Menkowitz' allegations of discrimination center around the terms and conditions of his employment as a staff physician at Pottstown Memorial Medical Center, which fall generally within the ambit of Title I. Title I defines "discriminate" to include, inter alia, "participating in a contractual or other relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter . .. . " 42 U.S.C.A. S 12112(b)(2). Title I also prohibits discrimination in the dispensation of "privileges."

But as the majority notes, the parties have characterized Dr. Menkowitz' relationship with the Pottstown Memorial Medical Center as "more in the nature of an independent contractor," raising the question whether he can state a claim under Title I. In Equal Employment Opportunity Comm'n v. Zippo Mfg. Co., 713 F.2d 32 (3d Cir. 1983), we articulated the appropriate standard to determine whether an individual constitutes an "employee" for purposes of the Age Discrimination in Employment Act, 29 U.S.C.A.SS 621–34 (West 1985 & Supp. 1998) (ADEA). After noting independent contractors are not employees within the meaning of the ADEA, we concluded "the hybrid standard that combines the common law `right to control' with the `economic realities' as applied in Title VII cases is the correct standard for determining employee status under ADEA." Id. at 38.5 By analogy, a staff physician like Dr.

_____

5. In reaching this conclusion, we compared the ADEA to Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. S 2000e–2000e–17 (West 1994 & Supp. 1998). The methods and manner of proof under the ADA mirror those applicable to Title VII and the ADEA. See Dykes v. DePuy, Inc., 140 F.3d 31, 39 (1st Cir. 1998) ("Since, as a matter of law Dykes was an independent contractor, the district court properly granted summary judgment on Dykes's ERISA, ADA, and state antidiscrimination claims"); Birchem v. Knights of Columbus, 116 F.3d 310, 312 (8th Cir. 1997) ("Like Title VII, the ADA protects `employees' but not independent contractors") (citation omitted); Alexander v. Rush N. Shore Med. Ctr., 101 F.3d 487, 492–93 (7th Cir. 1996) (noting "independent contractors are not

Menkowitz, whose duties may make him an independent contractor, may not qualify as an employee under the ADA. Irrespective, Title I more suitably addresses the context in which the complained conduct occurred.

I concur with the majority's analysis with respect to Dr. Menkowitz' claim under the Rehabilitation Act.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

_____

protected by Title VII" and finding physician cannot bring a Title VII alleging the hospital's revocation of his staff privileges constituted unlawful discrimination absent proof of an employment relationship, which did not exist because physician was independent contractor); Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div., 60 F.3d 153, 157 (3d Cir. 1995) ("In the context of employment discrimination, the ADA, ADEA and Title VII all serve the same purpose – to prohibit discrimination in employment against members of certain classes. Therefore, it follows that the methods and manner of proof under one statute should inform the standards under the others as well"); Spirides v. Reinhardt, 613 F.2d 826, 829 (D.C. Cir. 1979) (stating Title VII does not protect independent contractors).